Richmond

ESTELLE B. BURNS, ADMINISTRATRIX, ETC.

v.

THE EQUITABLE ASSOCIATES, ET AL.*

April 18, 1980.

Record No. 780655.

Present: All the Justices.

---

* Robert C. Nusbaum; V. H. Nusbaum, Jr.; Stanley L. Harrison; Henry A. Shook; H. H. B., Inc.; S. L. Nusbaum and Company, Inc.; Beatrice B. Epstein; Harold A. Epstein, individually and as executor under the will of Hyman Batleman; Peoples Bank of Virginia Beach; and Virginia National Bank. Though interested in the proceedings below, the two banks have no direct interest in this appeal.

*E. Leslie Cox (Edward L. Breeden, Jr.; Breeden, Howard & Mac-*

*Millan,* on briefs), for appellant.

*A. C. Epps; Gordon E. Campbell (Robert C. Nusbaum; Hofheimer, Nusbaum & McPhaul; Christian, Barton, Epps, Brent & Chappell; Campbell, Lustig & Hancock,* on brief), for appellees.

No brief or argument for The Equitable Associates, Peoples Bank of Virginia Beach and Virginia National Bank, appellees.

POFF, J., delivered the opinion of the Court.

Estelle B. Burns, formerly Estelle B. Batleman, administratrix d.b.n.c.t.a. of the estate of her late husband, Dr. Bernard B. Batleman, appeals from a decree determining, *inter alia,* Dr. Batleman's interest in an investment venture named the Equitable Associates. We are asked to review the chancellor's rulings as to the nature and extent of that interest.

The Equitable Associates was formed in 1963 when Dr. Batleman and others decided to purchase a leasehold estate in land in Norfolk. Created in 1903, the leasehold was a 20-year term perpetually renewable so long as the lessee fulfilled certain covenants. Pursuant to the requirements of the lease, an office building, known as the Equitable Building, had been built and maintained by a previous lessee. The lessor held a power of termination conditioned upon the lessee's breach of any covenant that remained uncured for sixty days after notice from the lessor.

Instead of acquiring the leasehold in their own names, the investors had the leasehold conveyed by deed from the seller to Robert C. Nusbaum as trustee. Citing Code § 55-17.1,[1] the recorded conveyance did not name the beneficiaries of the trust.

---

[1] When the leasehold was conveyed, Code § 55-17.1 read:

"No trust relating to real estate shall fail nor shall any use relating to real estate be defeated because no beneficiaries are specified by name in the recorded deed of conveyance to the trustee or because no duties are imposed upon the trustee. The power conferred by any such instrument on a trustee to sell, lease, encumber or otherwise dispose of property therein described shall be effective and no person dealing with such a trustee shall be required to make further inquiry as to the right of such trustee to act nor shall he be required to inquire as to the disposition of any proceeds.

"Nothing in this section shall be construed (1) to affect any right which a creditor may otherwise have against a trustee or beneficiary, (2) to enlarge upon the power of a corporation to act as trustee under § 6-9 [§ 6.1-5] or (3) to affect the rule against perpetuities."

Acts 1975, c. 375, added the following:

"In any case under this section, where there is a recorded deed of conveyance to a trustee, the interest of the beneficiaries thereunder shall be deemed to be personal property."

An unrecorded agreement among the trustee, the investors, and S. L. Nusbaum and Company, Incorporated (the Nusbaum Co.), detailed the investment plan. The Nusbaum Co. was appointed management agent to lease the office space and to attend to the daily operation of the building. In addition, the Nusbaum Co. supplied 25 percent ($5000) of the original cash invested. Dr. Batleman and his brother-in-law, Dr. Harold A. Epstein, each invested $2500 or 12.5 percent of the total. The remaining 50 percent was divided among three individuals named Belkov, Myers, and Burton. The agreement specified that the investors would hold their fractional beneficial interests as tenants in common. Each beneficial owner was entitled upon demand to a deed from the trustee conveying legal title to his undivided interest.

Shortly after the venture was formed, the Nusbaum Co. declared that it was holding its 25 percent interest as nominee for V. H. Nusbaum, Jr., Robert C. Nusbaum, Stanley L. Harrison, and Henry A. Shook (collectively, the Nusbaum Group), each of whom had an equal stake in the venture. Within a few months, H. H. B., Inc. (HHB), a corporation formed and owned by Dr. Batleman, Dr. Epstein, and Dr. Batleman's father, had purchased the 50 percent originally held by Belkov, Myers, and Burton. This brought to 75 percent the total interest of the Batleman Group, i.e., HHB and Drs. Batleman and Epstein. With Epstein's approval, Dr. Batleman, who was president of HHB and who routinely made investment and financial decisions for his brother-in-law, represented the Batleman Group in all its dealings with the Nusbaum Co.

Rental income from the office building usually was insufficient to cover operating expenses, taxes, insurance, and mortgage payments. Consequently, the Nusbaum Co. advanced money to fund the deficits and then called upon the investors for reimbursements according to their respective interests. Dr. Batleman made reimbursements greater than one eighth of the losses in 1966, 1970, and 1972. For those years, he paid 75 percent of the deficits, or the entire amount owed by the Batleman Group. Financial records of the Equitable Associates reveal that Dr. Batleman's disproportionate payments increased his share of the total "capital", or equity, while the shares of HHB and Dr. Epstein decreased ratably. The Nusbaum Group always paid 25 percent of the losses, and its share of capital remained constant at 25 percent. The Equitable Associates' financial statement for the year ending December 31, 1972 allocated to Dr. Batleman approximately 61 percent of the total capital account.

Dr. Batleman died on December 19, 1972. In his will, he left one

third of his net personal estate to his wife. The residue of his estate was devised and bequeathed to his parents "for...their joint lives, with the remainder to the survivor of them." Dr. Batleman's father qualified as executor, but he died on July 1, 1973. His widow passed away shortly thereafter, leaving a daughter, Beatrice B. Epstein (Dr. Epstein's wife), as sole beneficiary. Thus, Mrs. Epstein became entitled to that portion of Dr. Batleman's estate willed to his parents.

Estelle Batleman elected to renounce her husband's will and to claim her statutory share of his estate. Accordingly, she is entitled, under Code § 64.1-16, to one half of the surplus of Dr. Batleman's personal estate. After the death of Dr. Batleman's father, she qualified as administratrix d.b.n.c.t.a. of Dr. Batleman's estate.

In November 1974, Mrs. Batleman, in her individual capacity and as administratrix, filed a bill of complaint requesting, *inter alia*, a determination of the "extent and character of Decedent's interest in the Equitable Associates and its liability to pay this estate the value of Decedent's share...as well as any unrepaid advances". Among defendants named were Dr. Epstein, Mrs. Epstein, and the Equitable Associates; HHB and the individual members of the Nusbaum Group were not included.

Mrs. Batleman contended that Dr. Batleman's interest in the Equitable Associates was personalty. It appears from the report of the commissioner in chancery that this contention was premised upon the theory that the trust *res*, a leasehold, was personal property. Mrs. Batleman also claimed that the Equitable Associates was a partnership and that Dr. Batleman's contributions, insofar as they exceeded one eighth of the venture's losses, had increased his ownership interest from the original 12.5 percent. Deciding that the Equitable Associates was not a partnership and that the leasehold was realty, the commissioner ruled that Dr. Batleman's interest was that of a tenant in common with an undivided interest in real estate. Because not all the investors were before the court, the commissioner refrained from deciding the extent of Dr. Batleman's interest. These rulings were affirmed by the chancellor who, by decree entered April 27, 1977, declared that Dr. Batleman's interest in the leasehold "was not a partnership interest, but was an undivided interest of a tenant in common in real estate". The decree continued the cause to allow interested parties to intervene, but purported to be final "as to the matters adjudicated".

In the meantime, the leasehold had been sold in 1976 for $175,000. Pursuant to agreement among all interested parties, the net proceeds

were placed in escrow. This proceeding subsequently focused upon distribution of the escrowed fund.

In May 1977, HHB and all members of the Nusbaum Group intervened. Mrs. Batleman asserted a dower interest in her husband's one-eighth share and, as administratrix, claimed an "equitable lien" for $58,279.54, which she alleged was the amount of Dr. Batleman's "excess contributions". The other investors maintained that such contributions had increased Dr. Batleman's share of the equity in the venture. Members of the Nusbaum Group contended they were entitled to compensation for more than $87,000 they allegedly had paid to cover the venture's losses after Dr. Batleman's death.

Concerning the Nusbaum Group's claim for funds advanced, V. H. Nusbaum testified that, by May 1975, the Nusbaum Co. had advanced almost $82,000, not including $5,480.31 members of the group had repaid the company since Dr. Batleman died. In July of 1975, the members of the Nusbaum Group borrowed $80,000 in order to further reimburse the Nusbaum Co. According to V. H. Nusbaum, $60,000, or 75 percent of the loan, was applied to "the collective interest of" the Batleman Group. Nusbaum further testified that, through December 1975, the Batleman Group owed $87,689.16 excluding any interest on the $80,000 loan. The Nusbaum Co. did not charge the investors interest on the funds it advanced.

Evidence regarding the nature of Dr. Batleman's "excess contributions" consisted of financial records and the testimony of Dr. Epstein and Louis Wasserman, accountant for the Equitable Associates and the three members of the Batleman Group. As noted earlier, the Equitable Associates' financial statements showed that Dr. Batleman's payments increased his percentage of the equity in the venture. Dr. Batleman's share of the net profits or losses did not always correspond with his proportion of equity. For income tax purposes, Dr. Batleman claimed the losses stated in the records of the Equitable Associates. According to Wasserman, Dr. Batleman's payments of the Batleman Group's entire obligation increased his share of total capital while the shares of HHB and Dr. Epstein decreased. Wasserman also testified that the financial records of the members of the Batleman Group did not show that the other members were indebted to Dr. Batleman as a result of his disproportionate payments. Dr. Epstein testified that his brother-in-law had "handled" HHB's affairs until he died, that "whatever [Dr. Batleman] wanted to do was fine with me", and that Dr. Batleman had never demanded payment from either him or HHB for any funds paid on their behalf. Dr. Epstein, who succeeded Dr. Batleman as president of HHB, explained that

Dr. Batleman had increased his ownership interest and, while expressing some uncertainty, acknowledged that Dr. Batleman had "acquired" his additional interest from him and HHB.

Citing Code § 55-2, which provides in part that "[n]o estate of inheritance or freehold or for a term of more than five years in lands shall be conveyed unless by deed or will", the chancellor ruled by letter opinion that the investors' proportions of ownership had not been altered by any "advancements". He also ruled that, from the escrowed fund, the Nusbaum Co. should be compensated to the extent it had not already been reimbursed and that the members of the Nusbaum Group should be reimbursed for 75 percent of the $80,000 loan. Mrs. Batleman objected on the ground that Dr. Batleman's disproportionate payments, like the payments made by the Nusbaum Group, should be treated as advances, but the chancellor overruled her objection.

On February 17, 1978, the chancellor entered a decree adjudicating the parties' rights in the fund. The Nusbaum Co. was awarded $27,689.15 as compensation for operating expenses paid, plus $10,202.07 as reimbursement for 75 percent of the interest on the loan. (Apparently, the Nusbaum Co., not the Nusbaum Group, had paid the interest.) The decree provided that, aside from their individual shares, members of the Nusbaum Group would receive $60,000 collectively. This left $51,548.94 for distribution based upon the investors' ownership interests. Dr. Batleman's 12.5 percent interest, payable to Mrs. Epstein subject to claims of the estate's creditors, amounted to $6,443.62. From this sum, Mrs. Batleman, individually, was awarded dower of $1,271.75. The chancellor in no way compensated the estate or Mrs. Epstein for Dr. Batleman's having paid more than one eighth of the losses in 1966, 1970, and 1972.

On appeal, the administratrix maintains the court erred in ruling that Dr. Batleman's interest was realty and in not indemnifying the estate for "his advances or disproportionate capital payments". She does not claim that his ownership interest exceeded 12.5 percent. Mrs. Epstein assigns cross-error to the ruling that the ownership interest was only 12.5 percent. Also assigning cross-error, the Nusbaum Co. and members of the Nusbaum Group contend that the chancellor should have allowed them to recover the remaining 25 percent of the interest paid on the $80,000 loan.

Before discussing the merits, we address three procedural points raised by appellees.

█ Asserting that Mrs. Batleman stands to gain personally if this appeal is successful, appellees first argue that she, in her individual

capacity, is a "necessary party" to this appeal. We disagree. If the administratrix prevails, the estate will directly benefit; any benefit to Mrs. Batleman will be indirect. The personal representative, not a beneficiary of the estate, is the proper party to litigate on behalf of the estate.[2] *Graveley* v. *Graveley,* 84 Va. 145, 153, 4 S.E. 218, 221 (1887); *see Isbell* v. *Flippen,* 185 Va. 977, 981, 41 S.E.2d 31, 33 (1947).

▉ Next, appellees maintain that Mrs. Batleman, as administratrix, should not be allowed to prosecute this appeal because her interests allegedly conflict with those of Mrs. Epstein. Appellees view Mrs. Epstein as a beneficiary of Dr. Batleman's estate since she "stands in [her parents'] shoes". The conflict, if any, between the administratrix and Mrs. Epstein existed in the circuit court, but no one there attempted to prevent the administratrix's conduct of this suit. Following entry of the February 17, 1978 decree, appellees did assert that a conflict existed, but they sought no ruling on the point. The challenge they make here comes too late.

▉ Appellees further contend that the decree of April 27, 1977 was final as to the issues whether Dr. Batleman's interest was personalty and whether the investment venture was a partnership. Appellees argue that the administratrix may not attack the decisions on these issues since she did not timely appeal from that decree. The fallacy of their argument is that the 1977 decree was not a final order, *i.e.,* " ' "one which disposes of the whole subject, gives all the relief contemplated, provides with reasonable completeness for giving effect to the sentence, and leaves nothing to be done in the cause save to superintend ministerially the execution of the order." 4 Minor's Institutes, 860.' " *Daniels* v. *Truck Corporation,* 205 Va. 579, 585, 139 S.E.2d 31, 35 (1964), quoting *March't & Taylor* v. *Mathews Co.,* 139 Va. 723, 734, 124 S.E. 420, 423 (1924).

▉ Turning to the substantive issues, we initially consider whether the chancellor erred in holding that Dr. Batleman's interest in the investment venture was realty. To support her claim that the interest was personalty, the administratrix argues (1) that the trust was a "Virginia Land Trust" in which, she asserts, a beneficiary's interest must be personalty,[3] (2) that Dr. Batleman's interest was an interest

---

[2] To the extent Mrs. Batleman's dower or other personal interest may be adversely affected by the decision on appeal, she will not be heard later to complain.

[3] The parties devote much of their briefs to arguments about the nature of the property interest held by a beneficiary to the type of trust authorized by Code § 55-17.1 and about the purpose of the statute's 1975 amendment. See note 2, *ante.* However, nothing in the record indicates that any land trust theory was raised below.

in a partnership, and (3) that the leasehold held in trust was a chattel real and not real property. The last argument is logically primary; if the leasehold is personalty, the investors' interests must be personalty regardless of the organizational form assumed by the group.

The leasehold in question is an estate for years, albeit one subject to perpetual renewal. At common law, an estate for years was considered personalty which, for purposes of distribution, passed to a deceased lessee's personal representative. *Prince William* v. *Thomason Park,* 197 Va. 861, 867, 91 S.E.2d 441, 446 (1956). Absent statutory modification, this remains the law in Virginia. *Id.* The question is whether the renewability of the leasehold in this case somehow makes it real property.

Answering this question affirmatively, the commissioner in chancery relied upon *Norfolk* v. *Perry Co.,* 108 Va. 28, 61 S.E. 867 (1908), *aff'd,* 220 U.S. 472 (1911). That case involved a perpetually renewable, 99-year lease made by the City of Norfolk as lessor. The lessees, who had covenanted to pay all "public taxes... due on [the] land", challenged the City's authority to impose a real estate tax on the leasehold. Describing the lessees as "the substantial and real owners of the property", the Court ruled that "certainly for the purposes of taxation, the mere legal title remaining in the landlord will be disregarded and the burden of taxation placed where it belongs, upon the lessee to whom the value and the benefit belongs [*sic*]." 108 Va. at 30-31, 61 S.E. at 868.

Appellees contend that the instant case and *Perry* are "indistinguishable" and that *Perry* requires us to hold that the leasehold here is realty. We do not agree. The fundamental flaw in appellees' position is the fact that *Perry* did not hold that the leasehold there was realty. Rather, *Perry* decided "that an owner of a perpetual leasehold *may be taxed as though he were the virtual owner of the fee.*" [4] *Prince William* v. *Thomason Park, supra,* 197 Va. at 868, 91 S.E.2d at 446 (emphasis added). True, the *Perry* Court did say that the lessees could devise the leasehold "and their heirs will take in case there is no... devisee." 108 Va. at 30, 61 S.E. at 868. This language, unsupported by any authority, is pure *dictum.*[5]

We reject that *dictum.* In Maryland, the first jurisdiction in America

---

[4] An expansion of the *Perry* rule now appears as Code § 58-758, which provides that "the term 'taxable real estate' shall include a leasehold interest in every case in which the land or improvements, or both, . . . are exempt from assessment for taxation to the owner."

[5] The *dictum* ignored the fact that the lease in *Perry* had been renewed by the *executors* of a deceased predecessor in interest of the then current lessees.

in which the perpetually renewable estate for years was used, 2 R. Powell, The Law of Real Property ¶ 242 [1], at 372.12 (2d ed. 1977), the courts have always held that the lessee's interest is personalty. *Neuman* v. *Travelers Indemnity Co.,* 271 Md. 636, 641, 319 A.2d 522, 525 (1974); *Holzman* v. *Wager,* 114 Md. 322, 333, 79 A. 205, 207 (1911). Hence, the fact that an estate for years may be renewed forever does not alter its status as personalty. We are aware that statutes in some states alter the effects of that status. *See, e.g., Taylor* v. *DeBus,* 31 Ohio St. 468, 472 (1877). But there is no statute in Virginia providing that a perpetually renewable leasehold is to be treated like realty for purposes of ·dower or descent and distribution. Accordingly, we conclude that Dr. Batleman's interest in the subject leasehold was personal property that passed to his personal representative for administration.

■ We now focus our attention upon the chancellor's ruling and the parties' contentions concerning the effect of Dr. Batleman's payments exceeding his pro rata share of the operating deficits. Mrs. Batleman contends that such payments entitled Dr. Batleman to indemnification if the investors were partners, see Code § 50-18(b) and (c),[6] or contribution if the investors were simply tenants in common, see *Jenkins* v. *Jenkins,* 211 Va. 797, 799-800, 180 S.E.2d 516, 518 (1971). Mrs. Epstein, on the other hand, maintains that the excess payments increased Dr. Batleman's ownership interest from the original 12.5 percent. On brief, Dr. Epstein and HHB "concur" in Mrs. Epstein's position.

As we have observed, the final decree made no allowance for the payments in question. This does not mean, however, that the chancellor failed to rule on the question of the legal consequences of the payments. His reasoning on the subject is expressed in his letter opinion. Having stated that Code § 55-2 "is the authority for determining...ownership", the chancellor held that the statute's requirements for altering ownership had not been met. Since only Dr. Batleman's disproportionate payments were relevant to that question, this holding referred to those payments. Moreover, the chancellor's rejection of the administratrix's objection to his refusal to treat Dr. Batleman's

---

[6] It appears from the record that the administratrix never invoked these subsections in the court below. She did initially contend that the Equitable Associates was a partnership, but she then was claiming that the disproportionate payments had increased Dr. Batleman's equitable ownership. After entry of the 1977 decree, she maintained that Dr. Batleman's ownership had not been increased beyond the original 12.5 percent, but that his "excess contribution" gave his estate an "equitable lien" of $58,279.54 upon the sales proceeds.

payments like those of the Nusbaum Group obviously was a ruling that Dr. Batleman's disproportionate payments were not advances giving rise to a right to indemnity or contribution. Thus, the scope of the chancellor's decision regarding the payments is clear; he concluded that they were intended to increase Dr. Batleman's share of ownership[7] but that Code § 55-2 prevents recognition of the increase. Determination of the nature of Dr. Batleman's contributions depends upon his intentions and those of the other members of the Batleman Group. What those parties intended was a question of fact. Because credible evidence supports the chancellor's implicit finding, we affirm his decision that Dr. Batleman's disproportionate payments were designed to increase his ownership interest. Hence, the issue becomes whether the chancellor's application of Code § 55-2 was correct. We believe it was error to apply the statute in this case.

While its Virginian statutory antecedents date back to 1705,[8] Code § 55-2, sometimes called the statute of conveyances, *see, e.g., Smith* v. *Payne,* 153 Va. 746, 756, 151 S.E. 295, 298 (1930), apparently is based in part upon section three of the English Statute of Frauds, 29 Chas. II, c. 3 (1677).[9] In its borrowings from the English Statute,[10] the General Assembly has never adopted sections seven through nine. Section seven required all "declarations or creations of trusts . . . of any lands, tenements or herditaments" to "be manifested and proved" by a signed writing or the will of the settlor. Section eight exempted trusts arising by operation of law, *i.e.,* resulting and constructive trusts, from the requirements of section seven. The ninth section of the English Statute mandated that "grants and assignments" of trusts "be in writing, signed by the party granting or assigning . . . or by such last will or devise". Thus, as section seven prohibited oral trusts in realty, section nine proscribed oral transfers

---

[7] Dr. Batleman's share was augmented by transfers of portions of the shares of HHB and Dr. Epstein. In effect, Dr. Batleman purchased part of their interests by paying debts they owed the management agent. The interests of the members of the Nusbaum Group were unaffected by changes in ownership among the members of the Batleman Group.

[8] Acts 1705, c. 21, 3 Hening, Statutes at Large 318 (1823).

[9] "[N]o Leases, Estates or Interests, either of Freehold, or Terms of Years, or any uncertain Interest, not being Copyhold or Customary Interest, of, in, to or out of any Messuages, Manors, Lands, Tenements or Hereditaments, shall at any Time after the said four and twentieth Day of June be assigned, granted, or surrendered, unless it be by Deed or Note in Writing, signed by the party so assigning, granting or surrendering the same, or their Agents thereunto lawfully authorized by Writing, or by Act and Operation of Law." 8 Statutes at Large 405.

[10] Aside from the conveyancing provisions, the General Assembly first enacted a statute of frauds in 1785. Acts 1785, c. 64, 12 Hening, Statutes at Large 160 (1823).

of the interest of a trust beneficiary, G. G. Bogert & G. T. Bogert, Trusts and Trustees § 190 (2d rev. ed. 1979).

The omission of sections seven and eight compelled this Court in 1915 to hold that our statute of frauds does not bar the establishment by parol of an express trust in land. *Young* v. *Holland,* 117 Va. 433, 84 S.E. 637 (1915). A statute identical to Code § 55-2 existed then (Code of 1887, § 2413), but the Court did not mention that portion of the statute of frauds as an impediment to the oral creation of a trust. Rather, the major point of debate, see 117 Va. at 438, 84 S.E. at 639, was whether an oral trust in land was precluded by the provision that "[n]o action shall be brought upon . . . any contract for the sale of real estate, or for the lease thereof for more than a year unless it be in writing." But we cannot assume the Court was ignorant of the then existing predecessor to § 55-2. Some two years after deciding *Young,* this Court referred to that statute as part of our statute of frauds. *Marks* v. *Goria Bros.,* 121 Va. 491, 504, 93 S.E. 675, 679 (1917). And before *Young,* the Court had held that the same statute did not apply to a parol trust in the proceeds of realty. *Riggan's Adm'r* v. *Riggan,* 93 Va. 78, 90, 24 S.E. 920, 924 (1896). It is clear, therefore, that the holding in *Young* signifies that the statutory language "[n]o estate of inheritance or freehold or for a term of more than five years in lands shall be conveyed unless by deed or will" does not apply to the creation of a trust.

Despite the manifest import of *Young,* it was suggested in *Brame* v. *Read,* 136 Va. 219, 224, 118 S.E. 117, 119 (1923), that to permit one holding legal title to land to create a trust by oral declaration alone, *i.e.,* without a contemporaneous transfer of legal title by deed as had occurred in *Young,* "would be to convey an estate in land by parol, which is expressly prohibited by statute." *Brame's* suggestion is inexplicable *dictum.* The *Brame* Court had already expressly reaffirmed the *Young* rule. 136 Va. at 221, 118 S.E. at 118. Nothing in *Young* indicates that the Court viewed the written conveyance of legal title as essential to the rule announced there. As one commentator has acutely observed, "[i]t is difficult to justify the distinctions drawn. . . . If . . . the statute . . . precludes establishment of the oral trust in the [situation envisioned by the *Brame* Court] it should also preclude establishment of the trust in the [*Young*] situation, because in both situations the beneficial interests in the land are orally transferred to the *cestui que trust.*" J. Ritchie, N. Alford & R. Effland, Cases and Materials on Decedents' Estates and Trusts 511 (5th ed. 1977). The indefensibility of the *Brame dictum* is highlighted by the fact that the case relied upon by *Brame, Jesser* v. *Armentrout,* 100 Va. 666, 42

S.E. 681 (1902), explicitly left undecided the question whether a trust in land could be created orally. We conclude that *Brame* left the full import of *Young* unimpaired.

Given that Code § 55-2 does not bar the *establishment* of an oral trust in land or in a leasehold for more than five years, we see no reason why the statute should operate to bar the oral *transfer* of a beneficiary's interest in a trust. A settlor's creation of an oral trust for the benefit of another is, like a transfer by a beneficiary, a conveyance of an equitable interest. In addition, we attach significance to the legislature's omission from our statutes of section nine of the English Statute. As the exclusion of sections seven and eight implies a legislative decision to permit oral trusts, the absence of a proscription equivalent to section nine evinces a legislative intent to allow beneficiaries to convey their interests without a writing.[11] *See also* Restatement (Second) of Trusts § 138 (1959).

The investors in the case at bar were, of course, beneficiaries of a trust. Transfers of their beneficial interests were not, as between transferor and transferee, barred by Code § 55-2.[12] Accordingly, we hold that the chancellor erred in applying the statute to preclude recognition of the transfers from HHB and Dr. Epstein to Dr. Batleman. We will remand the case for determination of the final interests of these three investors, and Dr. Batleman's interest in the escrowed fund will be administered as part of his personal estate.[13]

■ Next, we consider the cross-error assigned by the Nusbaum Co. and the Nusbaum Group. The chancellor ordered that the company be reimbursed from the escrowed fund for 75 percent of the interest paid on the $80,000 loan. Reimbursement was limited because the chancellor found that only three quarters of the loan proceeds had been used to cover the Batleman Group's obligation and

[11] Our rationale does not extend to parol transfers of an equity of redemption by a beneficial owner of property held in trust to secure payment of a debt. Moreover, nothing in this opinion should be construed to apply to strangers to a parol transfer whose rights are protected by the recording acts or other statutes.

[12] Nor were they barred by the trust agreement's provision that "[t]he trustee and the management agent shall not be required to take notice of any unrecorded transfer of interest by any party hereto."

[13] The chancellor ruled, in effect, that the value of Dr. Batleman's interest should be based upon the $51,548.94 remaining in the escrowed fund after reimbursing the Nusbaum Co. and the Nusbaum Group for their "advances". No error is assigned to that ruling. Hence, we do not consider the administratrix's assertion, grounded in partnership law, see Code §§ 50-31(4), -43, that the value of Dr. Batleman's interest should be determined as of the date of his death. And, since resolution of the question whether the Equitable Associates was a partnership is not necessary to disposition of the issues properly before us, we do not review that question.

that the other 25 percent was attributable to the Nusbaum Group's obligation. These appellees now contend that the award to the Nusbaum Co. should have included the other 25 percent of the interest on the loan. They argue that, because the Batleman Group's cumulative obligations to fund the deficits subsequent to Dr. Batleman's death (including those accruing after the company had received the loan proceeds) exceeded $80,000, all the loan proceeds benefitted the Batleman Group. We do not find this argument persuasive. V. H. Nusbaum, president of the Nusbaum Co. and a member of the Nusbaum Group, acknowledged that only $60,000 was "applied to . . . the collective interest" of the Batleman Group. He also testified that the company did not charge the investors interest on funds it advanced. This evidence supports the chancellor's finding concerning interest, and we affirm his ruling on this question.

■ Finally, we raise *sua sponte* an issue of costs on this appeal. Having substantially prevailed here, the administratrix is entitled to recover her legitimate costs. But she may not recover costs of reproducing "parts of the record . . . included in the appendix unnecessarily at [her] direction". Rule 5:38. Some 80 percent of the appendix was designated by the administratrix. Of this portion, approximately one half is immaterial to the issues on appeal. Accordingly, we impose upon her the burden of 40 percent of the cost of producing the appendix. Other costs will be borne by appellees.

> *Affirmed in part,*
> *reversed in part,*
> *and remanded.*