PRESENT: All the Justices

THE GAME PLACE, L.L.C., ET AL.

OPINION BY
v.  Record No. 170631                                    JUSTICE D. ARTHUR KELSEY
MAY 10, 2018

FREDERICKSBURG 35, LLC


FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
Gordon F. Willis, Judge


A commercial lessor, Fredericksburg 35, LLC, sued a lessee, The Game Place, L.L.C.,[1]

for unpaid rent under a 15-year lease after The Game Place vacated the leasehold prior to the

expiration of the 15-year term.  The Game Place demurred, claiming that the lease was

unenforceable under the Statute of Conveyances, Code § 55-2, because it did not have either the

common-law formality of a seal or the relaxed seal substitutes available under Code § 11-3.

Reasoning that "[t]he law looks at substance not form," J.A. at 9, the trial court rejected

The Game Place's arguments and overruled the demurrer.  After a bench trial, the court entered

final judgment against The Game Place and its guarantor, Robert C. Lightburn.  Finding the 15-

year lease unenforceable as a matter of law, we reverse and enter final judgment in favor of The

Game Place and Lightburn.[2]

I.

In September 2000, a real-estate partnership, Amusement-Central Park Limited

Partnership, leased space in a commercial shopping center to Nicol, Inc.  The parties executed a

---

[1] Throughout this opinion, we refer to "The Game Place, L.L.C." as "The Game Place" and "Fredericksburg 35, LLC" as "Fredericksburg 35."

[2] Judge Herbert M. Hewitt entered the order denying the demurrer and rejecting The Game Place's argument regarding the Statute of Conveyances, *see* J.A. at 16-17, and Judge Gordon F. Willis entered the final judgment following a bench trial on unrelated issues, *see id.* at 253-54.

15-year lease requiring monthly payments. A year later, Amusement-Central Park Limited Partnership conveyed property which included the leasehold space to Carl D. Silver. *See id.* at 194. That same year Silver re-conveyed the property to the Carl D. Silver Company. *See id.* at 235-37. After selling the property, Amusement-Central Park Limited Partnership dissolved itself in 2001 and filed a certificate of cancellation with the State Corporation Commission in January 2002. *See id.* at 239.

In November 2002, the lessee, Nichol, Inc., assigned its rights and obligations under the lease to The Game Place.[3] *See id.* at 224-25. The lease required the written consent of the landlord to any such assignment. Though Amusement-Central Park Limited Partnership had ceased to legally exist, it executed the assignment as "LANDLORD" with the signature line stating "By: Silver GP, Inc., General Partner." *Id.* at 225 (altering capitalization).[4] The narrative becomes more tangled when, in December 2002, the Silver Company conveyed the property to Fredericksburg 35. *See id.* at 193-96.

The lessor-lessee relationship nonetheless continued without contest until years later when The Game Place found itself unable to keep up with the rent payments. In May 2014, The Game Place vacated the premises and terminated what it characterized as "its month-month periodic tenancy." R. at 688. The Game Place was current on its rent at that time. Rejecting The Game Place's characterization of the lease as month-to-month, Fredericksburg 35 responded with a suit seeking unpaid rent that had accrued since The Game Place had vacated the leasehold space. The Game Place demurred, arguing that the lease was unenforceable under the Statute of

---

[3] Lightburn executed the assignment as "GUARANTOR," with the signature line stating, "The unconditional guaranty of: [signature] Robert C. Lightburn." *Id.* at 225.

[4] In contrast, Amusement-Central Park Limited Partnership's certificate of cancellation identifies ACP Management I, LLC as the "Sole General Partner." *Id.* at 239.

Conveyances because it did not contain a seal as required by the common law for a deed or one of the substitutes for a seal available under Code § 11-3. The trial court overruled the demurrer. Following a bench trial, the court entered final judgment against The Game Place and Lightburn, jointly and severally, ordering them to pay $68,610.44 in unpaid rent and $17,152.61 in attorney fees pursuant to a lease provision allowing the landlord to recover 25% of the claim as attorney fees. *See* J.A. at 211, 253.

II.

On appeal, The Game Place contends that the trial court erred as a matter of law when it enforced the 15-year lease and, instead, should have recognized that the lessor-lessee relationship could only be enforced as a month-to-month tenancy.[5] We agree.

A. THE STATUTE OF CONVEYANCES

The Statute of Conveyances states in pertinent part that "[n]o estate of inheritance or freehold or for a term of more than five years in lands shall be conveyed unless by deed or will." Code § 55-2; *see Humble Oil & Ref. Co. v. Cox*, 207 Va. 197, 201, 148 S.E.2d 756, 760 (1966) ("The Lease purported to demise property for a term of more than five years, and Virginia law requires that such a demise be made in the form of a deed."). That provision's "statutory antecedents date back to 1705" and it appears to be "based in part upon section three of the English Statute of Frauds, 29 [Car. II] c.3 (1677)." *Burdette v. Brush Mt. Estates, LLC*, 278 Va. 286, 293, 682 S.E.2d 549, 553 (2009) (quoting *Burns v. Equitable Assocs.*, 220 Va. 1020, 1031,

---

[5] The Game Place also contends that the trial court erred when it entered judgment against Lightburn as guarantor of the assignment, *see supra* note 3, because Amusement-Central Park Limited Partnership could not consent to the assignment of the lease to The Game Place as it was no longer the landlord, rendering Lightburn's guaranty "of no effect" and also void for lack of consideration. *See* Appellants' Br. at 14-18. Given our holding, we need not address this contention.

3

265 S.E.2d 737, 744 (1980)); *see* 3 William Waller Hening, The Statutes at Large 318-19 (1812) (reprinting 1705 Act).

When applicable to an inter vivos conveyance, the Statute of Conveyances specifically requires a "deed" to effect the transfer. Code § 55-2. When a statute employs a common-law term of art, the General Assembly "is presumed to have known and to have had the common law in mind in the enactment of a statute" and we must "giv[e] effect to both 'unless it clearly appears from express language or by necessary implication that the purpose of the statute was to change the common law.'" *Jenkins v. Mehra*, 281 Va. 37, 44, 704 S.E.2d 577, 581 (2011) (citation omitted); *see also Tvardek v. Powhatan Vill. Homeowners Ass'n, Inc.*, 291 Va. 269, 276 n.4, 784 S.E.2d 280, 283 n.4 (2016) ("A statute touching on matters of common law must 'be read along with the provisions of the common law, and the latter will be read into the statute unless it clearly appears from express language or by necessary implication that the purpose of the statute was to change the common law.'" (citation omitted)).

B. THE ENGLISH COMMON LAW OF SEALED DEEDS

It is "almost impossible to trace the history of seals back to the time when they were first employed." 1 Robert T. Devlin, The Law of Real Property and Deeds § 242, at 345 (3d ed. 1911). Chancellor Kent found the common-law custom of sealing documents to be "corroborated by the usages and records of all antiquity, sacred and profane." 4 James Kent, Commentaries on American Law 444-45 (1830); *see also* 1 Devlin, *supra*, § 242, at 345-46 (describing the ancient origins of sealing); 2 John B. Minor, Institutes of Common and Statute Law 727-28 (4th rev. ed. 1892) (same).

For our purposes, the historical analysis focuses on English common law at the time of the Founding.[6] At that time, a deed had certain defined characteristics. One of them was that it had to be a "sealed" writing. *See* 2 William Blackstone, Commentaries \*295.[7] The seal was "deemed essential" and was "requisite" to the conveyance of land by deed. 4 Kent, *supra*, at 443-44. We have never taken issue with this view. "One of the essential requisites of a deed," we have emphasized, "is that it shall have a seal affixed thereto." *Smith v. Plaster*, 151 Va. 252, 258, 144 S.E. 417, 419 (1928).[8] The historic justification for the seal requirement in deeds of conveyance was two-fold, with both explanations stemming from the goal of orderly conveyance of real property that has always been integral to the Anglo-American legal tradition.

First, "affixing a seal to a signature to a deed gives solemnity" to this uniquely important transaction. *Bank of Chatham v. Arendall*, 178 Va. 183, 192, 16 S.E.2d 352, 355 (1941). We

---

[6] *See In re: Brown*, 295 Va. 202, 208 & n.1, 810 S.E.2d 444, 447 & n.1 (2018) (describing Virginia's reception of the common law through Code § 1-200 in 1776); *Tvardek*, 291 Va. at 274 n.1, 784 S.E.2d at 282 n.1 (same).

[7] At common law, a seal was "an impression upon wax or wafer, or some other tenacious substance capable of being impressed." 4 Kent, *supra*, at 444; *see also* 3 Sir Edward Coke, Institutes of the Laws of England 169 (1797) (translation of original text); 2 Sir Frederick Pollock & Frederic William Maitland, The History of English Law Before the Time of Edward I 224 (2d ed. 1898). Prior to the Norman Invasion, the Saxons used "the sign of the cross," accompanied by their signatures if they were literate, as a solemn identifying mark. *See* 2 Blackstone, *supra*, at \*305-06.

[8] *See also Burnette v. Young*, 107 Va. 184, 191, 57 S.E. 641, 643 (1907) (noting that "[i]t is requisite . . . that the party whose deed it is should seal it," and that "a seal is essential to a deed") (quoting 2 Minor, *supra*, at 727)); *Penn v. Hamlett*, 68 Va. (27 Gratt.) 337, 341-42 (1876) ("One of the essential requisites constituting a deed is, that it should be written, as well as signed, sealed and delivered."). *See generally* Christopher G. Tiedeman, An Elementary Treatise on the American Law of Real Property § 808, at 636-37 (1885) ("The word deed means an instrument under seal, and, except in those States where seals are by statute dispensed with, no instrument can be called a deed without being sealed, whatever may be the intention of the parties."); 3 Emory Washburn & John Wurts, A Treatise on the American Law of Real Property § 2128, at 245 (6th ed. 1902) ("The sealing of deeds was indispensably necessary at common law, in order to their validity, at least after the time of Edward III.").

inherited this view from the Normans, whom Blackstone described as "a brave but illiterate nation" responsible for bringing the tradition of seals to England after the 1066 invasion by William the Conqueror. *See* 2 Blackstone, *supra*, at 305-06.[9] The Normans "used the practice of sealing only, without writing their names: which custom continued, when learning made its way among them, though the reason for doing it had ceased." *Id.* "[S]ealing alone," Blackstone reports, "was sufficient to authenticate a deed" even if the deed was unsigned. *Id.* at 306. Seals acquired this importance in part because "they obviously made the evidence of the [instrument] better, in so far as the seal was more difficult to forge than a stroke of the pen." Oliver Wendell Holmes, Jr., The Common Law 272 (1923). The seal thus provided the highest form of certitude for one of the most important legal transactions.[10]

Second, "[a]t common law a sealed instrument imposed peculiar liabilities." *Preston v. Hull*, 64 Va. (23 Gratt.) 600, 604 (1873). One of these liabilities, though somewhat unclear in its origins,[11] was the enforcement of sealed instruments even in the absence of bilateral consideration. "In a contract under seal, a valuable consideration *is presumed* from the *solemnity of the instrument*, as a matter of public policy and for the sake of peace, and presumed

---

[9] Because "much of the population was illiterate and unable to sign their names," a person's seal could "serve much the same purpose as a signature. When attached to a document, it became an identification of the person executing it." 14 Richard R. Powell, Powell on Real Property § 81A.04[1][f], at 81A-57 (Michael Allan Wolf ed., 2017).

[10] *See Penn*, 68 Va. (27 Gratt.) at 341 ("Deeds are of a higher nature than parol contracts, and there are great and important distinctions between the operations and effect of these different species of contracts.").

[11] Experience tells us, of course, that we cannot expect "that the particular reason of every rule in the law can at this distance of time be always precisely assigned." 1 Blackstone, *supra*, at *70. We search the history of our laws not laboring under the illusion of achieving absolute certitude but to discover the most probable view of our jurisprudential ancestors. *See generally* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 399-402 (2012).

*conclusively . . . .*" *Norris v. Barbour*, 188 Va. 723, 736, 51 S.E.2d 334, 339 (1949) (emphases in original).[12]  With a sealed instrument, therefore, "it d[id] not matter how the obligation arose, or whether there was any consideration for it or not."  Holmes, *supra*, at 270.[13]  An instrument "under seal was no longer a promise well proved; it was a promise of a distinct nature, for which a distinct form of action came to be provided."  *Id.* at 272-73; *see* 9 W.S. Holdsworth, A History of English Law 155-59 (1926) (describing the origins of the doctrine of estoppel by deed in the common-law seal requirement).

Thus, "the seal furnished a convenient means by which an intentional promise, voluntarily made (i.e., without consideration) could be binding."  1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 2:16, at 175 (4th ed. 2007).  Though the seal requirement, when unsatisfied, "occasionally defeated the intent of the parties, the seal served its purpose of permitting obligors to bind themselves without consideration."  *Id.* at 176-77.  Professor Williston recognized the need for and the ongoing development of legislative reforms

_____

[12] *See also Watkins v. Robertson*, 105 Va. 269, 279, 54 S.E. 33, 36 (1906) (same); 3 Minor, *supra*, at 139 (2d rev. ed. 1895) (same).  We acknowledge the criticism of some scholars that "[i]t is misleading to say, as courts have sometimes done, that a seal 'imports consideration' or that it raises a 'presumption of consideration.'  As we have seen, the action of covenant long antedated the general notion that an unsealed promise was enforceable if supported by consideration.  Far from deriving its effect from the doctrine of consideration, the seal was a distinct and independent alternative basis for the enforcement of a promise."  1 E. Allan Farnsworth, Farnsworth on Contracts § 2.16, at 154 (3d ed. 2004 & Supp. 2018-1) (footnotes omitted).  For our purposes, however, either manner of making the point suffices to explain why sealed instruments are enforceable without consideration.

[13] *See also Georgeton v. Reynolds*, 161 Va. 164, 173, 170 S.E. 741, 744 (1933) ("All of these contracts were under seal and were therefore supported both constructively and actually by valuable considerations.").  In Virginia, however, a chancellor exercising equity jurisdiction has the authority to examine the absence of consideration even for a sealed instrument when a "conveyance is attacked for fraud, mistake, oppression or unconscionableness."  *Cooper v. Gregory*, 191 Va. 24, 31, 60 S.E.2d 50, 53 (1950); *see also Norris*, 188 Va. at 735-37, 51 S.E.2d at 339-40; *Seward v. Camp Mfg. Co.*, 112 Va. 479, 486, 71 S.E. 614, 616-17 (1911); *Watkins*, 105 Va. at 278-80, 54 S.E. at 36-37.

to the seal requirement, but he argued "that the seal has served and continues to serve a valid function, that being to make binding promises without consideration, and to suggest that some device for performing that function is not only appropriate, but in some cases necessary." *Id.* at 177.[14]

## C. THE STATUTORY REFORMS TO THE SEAL REQUIREMENT

Almost immediately upon the reception of English common law in the United States, state legislatures began to make a host of statutory changes to the common-law seal requirement.[15]  In 1788, the General Assembly of Virginia enacted a statute to permit the use of a "scroll[16] by way of seal" as an alternative to the traditional wax-imprinted seal.  *See* 1788 Acts ch. 67, at 35 (codified as amended at Code § 11-3) (altering archaic spelling).  An instrument

---

[14] At common law, seals implicated various doctrines such as the "equal dignity" rule requiring amendments to sealed instruments to likewise be sealed, *see Sachs v. Owings*, 121 Va. 162, 171-72, 92 S.E. 997, 1000 (1917); the capacity of unnamed third parties to enforce an agreement, *see* Code § 55-22 (superseding common-law rule prohibiting unnamed third-party beneficiaries from suing on covenants or promises); *Levine v. Selective Ins. of Am.*, 250 Va. 282, 285, 462 S.E.2d 81, 83 (1995); *Ward v. Ernst & Young*, 246 Va. 317, 329, 435 S.E.2d 628, 634 (1993); *Thacker v. Hubard & Appleby, Inc.*, 122 Va. 379, 387-91, 94 S.E. 929, 931-32 (1918); *Newberry Land Co. v. Newberry*, 95 Va. 119, 120-21, 27 S.E. 899, 899-900 (1897); 4 Minor, *supra*, at 451 (3d rev. ed. 1893); the authority of an agent to bind a principal on a sealed contract, *see Forrest v. Hawkins*, 169 Va. 470, 476, 194 S.E. 721, 723 (1938); and the enforceability of releases lacking bilateral consideration, *see Ferries Co. v. Brown*, 121 Va. 13, 17, 92 S.E. 813, 814 (1917); 3 Eric Mills Holmes, Corbin on Contracts § 10.18[F][3], at 430 (Joseph M. Perillo ed., rev. ed. 1996) [hereinafter "Holmes, Corbin on Contracts"].

[15] *See generally* 3 Holmes, Corbin on Contracts, *supra* note 14, § 10.18[A]-[B], at 418-22 (listing 26 jurisdictions that have abolished private seals altogether and 12 jurisdictions that have abolished the seal requirement for conveyances of real property).

[16] A "scroll" is "[a] written mark; esp[ecially], a character affixed to a signature in place of a seal."  Black's Law Dictionary 1549 (10th ed. 2014); *see also* James A. Ballentine, A Law Dictionary 458 (1916) (defining a scroll as "a scrawl or flourish intended as a seal"); 2 John Bouvier, A Law Dictionary 500 (10th rev. ed. 1860) (defining a scroll as "[a] mark which is to supply the place of a seal, made with a pen or other instrument on a writing"); Samuel Johnson, A Dictionary of the English Language (3d rev. ed. 1768) (defining a "scrawl" as an "[u]nskillful and inelegant writing" (capitalization omitted) (altering archaic spelling)).

bearing such a scroll would be treated in law "as if it were actually sealed." *Id.* (altering archaic spelling). The current version of the statute provides in pertinent part:

> Any writing to which a natural person . . . making it affixes a scroll by way of a seal, shall be of the same force as if it were actually sealed. The impression or stamping of a corporate or an official seal on paper or parchment alone shall be as valid as if made on wax or other adhesive substance. And any writing to which a natural person . . . making it affixes his signature . . . and which writing in its body says "this deed," or "this indenture," or other words importing a sealed instrument, or recognizes a seal, shall be of the same force as if it were actually sealed by such person . . . ; and any writing signed by a natural person . . . and regularly acknowledged before an officer authorized to take acknowledgments of deeds to be recorded in this Commonwealth, in the body of which writing it clearly appears that the person so signing and acknowledging the same intends to and does grant or convey . . . certain real estate therein described, . . . shall pass the title to such real estate as effectually as if it were written and executed in strict accordance with the provisions of [Code] § 55-48 [providing a permissible form for a deed] . . . .

Code § 11-3.

This statute does not abolish the seal requirement. Instead, it relaxes the seal requirement by offering a limited list of specific substitutes for a seal. These substitutes include (1) "a scroll by way of a seal"; (2) an imprint or stamp "of a corporate or an official seal on paper or parchment"; (3) the use in the "body of [such] writing" of the words "'this deed,' or 'this indenture,' or other words importing a sealed instrument" or recognizing a seal; or, finally, (4) a proper acknowledgement of a document clearly demonstrating an intent to convey real estate "before an officer authorized to take acknowledgments of deeds." *Id.* The statute does not identify when a seal is necessary but instead only addresses ways to make a written instrument compliant with the seal requirement if either the common law or a statute require a seal.

D. THE UNSEALED 15-YEAR LEASE

The 15-year lease in this case did not include a seal of any kind, thus failing to satisfy the common-law seal requirement embedded in the definition of "deed" under the Statute of

9

Conveyances, *see* Code § 55-2. Nor did the lease include any specific seal substitutes recognized in Code § 11-3. The trial court, however, held that the lease "me[t] the requirements of a deed" because "[t]he seventeen page Agreement of Lease *exemplifies* a sealed instrument as *alluded to* in [Code §] 11-3 even though it is not referred to as 'this deed' or 'this indenture.'" J.A. at 9 (emphases added). The trial court reasoned that "[t]he law looks at substance not form. The subject lease could just as easily have been entitled 'Deed of Lease' or 'Lease Indenture.'" *Id.* For several reasons, we disagree with the trial court's interpretation of Code § 11-3.

First, the court's logic appears to be that a lengthy contract — simply because of its length — "exemplifies a sealed instrument as alluded to in [Code §] 11-3." J.A. at 9. We are aware of no authority supporting this proposition. Under the common law, a sealed contract means just that, a contract with a seal. The contract can be short or even cryptic, but its brevity or verbosity reveals nothing about whether it is sealed or unsealed.

We similarly disagree with the inference the court drew from the observation that the "lease could just as easily have been entitled 'Deed of Lease' or 'Lease Indenture.'" *Id.* By statute, the words "this deed" or "this indenture" must appear in the body of the instrument, *see* Code § 11-3, not merely the title. But, more importantly, even if we interpret the trial court as holding that the lease could have simply used the statutorily approved words "this deed" or "this indenture" in the body of the document, the parties did not do so. The relative ease with which a party can comply with a statute is hardly a basis for excusing him when he does not even comply with the minimal requirements imposed on him. If anything, the opposite is true.

Second, we must also pause briefly over the trial court's reflection that "[t]he law looks at substance not form." J.A. at 9. Though it is more properly understood as a maxim of equity, we

10

nonetheless acknowledge and respect this principle and its underlying sentiment.[17] Even so, taken at face value, this aphorism itself lacks substance. Both the common law and statutory law create a virtual architecture of rules that necessarily draw lines. At the margins the lines may seem arbitrary. But those lines create a structure, and when viewed as a systemic whole they provide predictability and stability.

Courts cannot jettison "form" in favor of "substance" as an overarching philosophy of law. It would be naïve, after all, to think that doing so would improve the judicial line-drawing exercise. Courts would simply replace categorical, predictable, bright lines with ad hoc, unpredictable, blurry lines. This case provides a useful illustration. The trial court's reliance on the substance-over-form maxim enabled it to effectively abolish the seal requirement for a "seventeen page" lease because its length "exemplifies a sealed instrument as alluded to in [Code §] 11-3." J.A. at 9.[18] What about a 10-page lease or, for that matter, a very concise 5-page lease? Are lengthy boilerplate leases to be favored over succinct leases tailored to a specific transaction? Truth be told, courts can never fully escape the line-drawing exercise that the

---

[17] *See, e.g.*, *Virginia Mach. & Well Co. v. Hungerford Coal Co.*, 182 Va. 550, 556, 29 S.E.2d 359, 362 (1944) ("Equity looks at the substance of a transaction and not its mere form." (citation omitted)); *Hinman v. Mason*, 149 Va. 267, 272, 136 S.E. 573, 574 (1927) (same), *aff'd on reh'g*, 149 Va. 267, 273, 141 S.E. 144, 144 (1928); *Ruckdeschall v. Seibel*, 126 Va. 359, 373, 101 S.E. 425, 430 (1919) (same); *Rinehart & Dennis Co. v. McArthur*, 123 Va. 556, 570, 96 S.E. 829, 834 (1918) (same); *Straley v. Esser*, 117 Va. 135, 143, 83 S.E. 1075, 1078 (1915) (same); *Pace v. Pace's Adm'r*, 95 Va. 792, 800, 30 S.E. 361, 364 (1898) (same); *Shepherd's Adm'r v. Chapman's Adm'r*, 83 Va. 215, 224, 2 S.E. 273, 277 (1887) (same); *Poindexter's Ex'rs v. Green's Ex'rs*, 33 Va. (6 Leigh) 504, 514 (1835) (same); *Watts v. Kinney*, 30 Va. (3 Leigh) 272, 295 (1831) (same).

[18] This reliance on length played no role in *Granva Corp. v. Heyder*, which involved a "very comprehensive" lease that "contain[ed] practically every conceivable provision found in leases of property," 205 Va. 660, 662, 139 S.E.2d 77, 79 (1964). The lease violated Code § 55-2 by failing to include a corporate seal and thus was unenforceable. *See id.* at 662-65, 139 S.E.2d at 79-81. At no point in our analysis did we consider the length or even the comprehensive nature of the lease as a possible ground for excusing the statutory violation.

11

"form" of the law requires — which is why elevating "substance" over "form" as the ultimate jurisprudential ideal is illusory.

When taken too far, the substance-over-form maxim can also sideline "the larger premise that, before any legal question can be answered, an *a priori* question must first be asked — who has the authority to decide. It is the one question that precedes all others." *Boone v. Harrison*, 52 Va. App. 53, 62, 660 S.E.2d 704, 708 (2008). Before asking where to draw the substance-form line, we must first ask who has the power to draw it. That is an easy question to answer in this case. The seal requirement comes to us from centuries of common-law precedent. The seal substitutes come to us from the General Assembly. We have no authority to summarily dismiss either.

We made this point in *Gordon v. Funkhouser*, 100 Va. 675, 42 S.E. 677 (1902). In that case, the appellant challenged the continuing relevance of the seal requirement and called upon us to abolish it in the interest of modernity. We acknowledged the argument but offered this reply:

> In answer to the argument that the solemnity attaching to a sealed instrument no longer exists; that under the business conditions of this day no difference in facts exists between a sealed and an unsealed instrument, and that the former decisions of this court to the contrary should be overruled, we cannot do better than to add . . . "[t]hat [even though] a spirit of self-reliance and directness of purpose . . . will prompt the people of this age and country to disregard the formalities of conveyancing, and the rules of law by which they are described, [that fact] can constitute no sufficient reason, nor furnish any adequate authority to the court to change the law or overthrow plain, intelligible, and well-settled legal principles. That is the province of the Legislature, not of the judiciary."

*Id.* at 684-85, 42 S.E. at 680 (quoting *Stinchcomb v. Marsh*, 56 Va. (15 Gratt.) 202, 211

(1858)).[19]  We find ourselves in good company with these views.  Chief Justice John Marshall spoke directly to this issue while riding circuit in Virginia:

> [T]here are certain technical rules growing out of the state of things, when many of our legal principles originated, which are firmly [e]ngrafted on the law, and still remain a part of it, though the circumstances in which they had their birth are totally changed.  Perhaps every distinction between a sealed and an unsealed instrument is of this description.  But the distinction, and the rules which are founded on it, have taken such fast hold of the law, that they can be separated only by the power of the legislature.  Till that authority shall interpose, the courts must respect the rules as they are found in adjudged cases.

*United States v. Nelson*, 27 F. Cas. 82, 84 (C.C.D. Va. 1822) (No. 15,862); *see also Preston*, 64 Va. (23 Gratt.) at 607 ("It is sufficient to say that [the distinctions between sealed and unsealed instruments] exist; having their origin in well established principles.  In the language of Chief Justice Marshall, they have taken such firm hold of the law [that] they can only be removed by the power of legislation.").[20]

Our deference to the legislature is especially warranted on the subject of sealed instruments because the General Assembly has specifically modified the common law in various ways without abolishing the seal requirement.  The legislature has rendered seals inoperative in contracts for the sale of goods and in lease contracts governed by the Uniform Commercial

---

[19] As one commentator well said, "the law has been somewhat relaxed in favor of custom and convenience in doing business, yet the relaxation is confined to the *manner* of making a seal. . . .  If it should be thought that, in the present state of society, it would be best to put all writings on the same footing, the legislature alone has power to accomplish it."  1 Devlin, *supra*, § 245, at 352 (emphasis in original) (citation omitted).

[20] We acknowledge that we have sometimes expressed, in dicta, criticism of the seal requirement as irrelevant in cases in which parties attempted to use the seal requirement to defeat claims based "upon [an] independent promise to pay, which would be valid though not under seal," as opposed to a claim that seeks to enforce a "deed, as an instrument under seal." *See, e.g.*, *Harris v. McKay*, 138 Va. 448, 455, 122 S.E. 137, 139 (1924).  The present case, however, involves the latter rather than the former claim.

13

Code, *see* 1964 Acts ch. 219, at 302 (codified as amended at Code § 8.2-203); 1991 Acts ch. 536, at 902 (codified as amended at Code § 8.2A-203); made seals unnecessary to establish the validity of surety bonds taken before courts and their officers, *see* 1979 Acts ch. 211, at 272 (codified as amended at Code § 49-18.1); and made seals similarly unnecessary to establish the validity of a bond made on behalf of a fidelity and surety insurer under a power of attorney, *see* 1912 Acts ch. 328, at 654-55 (codified as amended at Code § 38.2-2420).

The General Assembly has also changed the common-law rule that a defendant could not claim a set-off in response to a plaintiff's claim based on an instrument under seal, *see* 1830 Acts ch. 11, at 62 (codified as amended at Code § 8.01-422); *Kinzie v. Riely's Ex'rs*, 100 Va. 709, 714, 42 S.E. 872, 873-74 (1902); done away with the sealed-unsealed distinction in the statute of limitations for written contracts, *see* 1977 Acts ch. 617, at 1089 (codified as amended at Code § 8.01-246(2)); retroactively validated real-estate deeds lacking a proper corporate seal or attestation, *see* 1942 Acts ch. 436, at 698-99 (codified as amended at Code § 55-136); made seals unnecessary in corporate deeds, *see* 1975 Acts ch. 500, at 994 (codified as amended at Code § 55-119); and validated all deeds and other documents executed by agents or attorneys in fact on behalf of individuals in the armed forces despite the power of attorney or agency agreement being defective for lack of a seal, *see* 1946 Acts ch. 130, at 190 (codified as amended at Code § 55-56).

In these and other ways, the General Assembly has engaged the common-law seal requirement but has never abolished it altogether for deeds governed by the Statute of Conveyances. Whether the legislature should do so is not for us to say. We ask only if the legislature already has; we answer that it has not.

14

E.  THE SAVING STATUTE

The trial court resolved this case based entirely on its substance-over-form analysis as applied to the seal-substitute statute, Code § 11-3.  The lessor, Fredericksburg 35, argues on appeal that another statute, Code § 55-51, cures any error in the trial court's reasoning because that statute directly overrules the common-law seal requirement for deeds covered by the Statute of Conveyances.[21]  We disagree.

Code § 55-51 provides in full:  "Any deed, or a part of a deed, which shall fail to take effect by virtue of this chapter shall, nevertheless, be as valid and effectual and as binding upon the parties thereto, so far as the rules of law and equity will permit, as if this chapter had not been enacted."  By its plain terms, this saving statute only saves deeds that "fail to take effect by virtue of this chapter."  Code § 55-51.  This saving statute appears in Chapter 4 of Title 55. Nowhere in that chapter is there a statutory requirement that deeds be under seal.  That requirement, as earlier observed, comes from the common law and is incorporated into the definition of "deed" in the Statute of Conveyances, *see* Code § 55-2, neither of which can be found in Chapter 4 of Title 55.

The final phrase of the saving statute, declaring a statutorily noncompliant deed to "be as valid and effectual and as binding . . . *as if this chapter had not been enacted*," Code § 55-51 (emphasis added), adds support for this limitation.  If Chapter 4 of Title 55 had never been enacted, our analysis would not be different.  The common-law seal requirement antedated the General Assembly's existence, and the legislative antecedent to the Statute of Conveyances

_____

[21] As an appellee, Fredericksburg 35 may raise this argument on appeal even though the trial court never addressed it because it involves an assertion of law offered in support of, not in contest with, the lower court's judgment.  *See Robert & Bertha Robinson Family, LLC v. Allen*, 295 Va. 130, 141 & n.9, 810 S.E.2d 48, 54 & n.9 (2018).

made its first appearance in the Code of Virginia in 1705, *see Burns*, 220 Va. at 1031 & n.8, 265 S.E.2d at 744 & n.8; 3 Hening, *supra*, at 318-19. So, even if Chapter 4 of Title 55 never existed, the seal requirement would nevertheless govern deeds of lease with a term exceeding five years.

Unpersuaded by this reasoning, Fredericksburg 35 points out that two provisions in Chapter 4 of Title 55 provide suggested deed forms to which Code § 55-51 allegedly provides an exception. Code § 55-57 states that "[a] deed of lease *may* be made in the following form" and then includes the attestation clause: "Witness the following signature and seal (or signatures and seals)." (Emphasis added.) Code § 55-48, the other statute on which Fredericksburg 35 relies, does not mention a seal. In fact, in 2014, this recommended form for general deeds contained the same attestation clause as Code § 55-57, but the General Assembly removed the language referring to seals, replacing it with the attestation clause: "Witness the following signature (or signatures)." *See* 2014 Acts. ch. 338, at 554 (codified as amended at Code § 55-48). Tellingly, the General Assembly did not remove the seal language in its recommended form for deeds of lease.

Nonetheless, neither Code § 55-57 nor Code § 55-48 contain seal requirements that Code § 55-51 operates to suspend. Neither of these statutes *imposes* a seal requirement on deeds, which the common law and the Statute of Conveyances have already accomplished. These provisions only offer recommended language — purely permissive, not mandatory — for deeds already required to be under seal. The presence or absence of either statute has no effect on the seal requirement.[22]

_____

[22] Fredericksburg 35 also suggests that the saving statute applies because the only "defect, if it is a defect," Appellee's Br. at 8, is that the lease does not employ one of the seal substitutes such as the words "this deed" or "this indenture," Code § 11-3. *See* Appellee's Br. at 7-9. Code § 11-3, however, does not *require* the use of substitutes for a seal. It only provides alternatives to satisfy the common-law requirement of a seal. Moreover, Code § 11-3 is not

16

When a lease violates the common-law seal requirement, the lease *as such* cannot be enforced in an action for damages by either party against the other. The written lease "may be repudiated as soon as made by either party because it is not binding on them." *Granva Corp. v. Heyder*, 205 Va. 660, 664, 139 S.E.2d 77, 81 (1964). The ability to repudiate does not mean that a court should wholly ignore the actual lessor-lessee relationship that may have been created based upon the parties' mistaken assumption about the legal validity of the written lease.[23] Its invalidity, after all, was caused solely by creating a lease term exceeding five years, thus violating the Statute of Conveyances and the common-law seal requirement for deeds subject to that statute.

In *Granva Corp.*, we recognized that "when a tenant takes possession under a defectively executed instrument a tenancy is created," *id.*, adopting the approach taken by New York courts in *Laughran v. Smith*, 75 N.Y. 205 (1878), and *Reeder v. Sayre*, 70 N.Y. 180 (1877). In *Laughran*, a verbal lease agreement violated the statute of frauds applicable to lease terms greater than one year. The court acknowledged that the lease was void but stated that, nevertheless,

> it has long been settled that when the tenant enters, and occupies, the agreement regulates the terms on which the tenancy subsists, in all respects, *except as to the duration of the term*. It is a reasonable inference in such case from the circumstances that the parties intended a tenancy on the terms of the original agreement, and the law implies a new contract between the parties corresponding therewith, *so far as it is not in conflict with the statute*.

---

located in Chapter 4 of Title 55.

[23] Nor does the ability to repudiate mean that equitable remedies are unavailable. *See generally Granva Corp.*, 205 Va. at 664, 139 S.E.2d at 80; 1 Devlin, *supra*, § 246, at 353; 14 Powell, *supra* note 9, § 81A.04[1][f], at 81A-57; 4 Herbert Thorndike Tiffany, The Law of Real Property § 1024, at 323 (3d ed. 1975 & Supp. 2017-2018).

*Laughran*, 75 N.Y. at 209 (emphases added) (citation omitted). The court in *Reeder* came to a similar conclusion:

> The agreement, though by parol, and void as to the term and the interest in lands sought to be created, regulates the relations of the parties to it in other respects upon which the tenancy exists, and may be resorted to [in order] to determine their rights and duties, in all things consistent with, and not inapplicable to a yearly tenancy, such as the amount of rent to be paid, the time of year when the tenant could be compelled by the landlord to quit, and any covenants adapted to a letting for a year.

*Reeder*, 70 N.Y. at 184.

We found this reasoning persuasive in *Granva Corp.* and still do. Once the invalid 15-year term is excised from the lease, the tenancy created is implied from "the manner in which the rent is received." *Granva Corp.*, 205 Va. at 664, 139 S.E.2d at 81 (citing *Stores Bldg. Corp. v. Conover*, 204 Va. 457, 459-61, 132 S.E.2d 458, 460-61 (1963)). In this case, rent was received on a monthly basis during the entirety of the lessor-lessee relationship. The occupation of the premises and the monthly payment of rent in this case implies a month-to-month tenancy, *cf. Elliot v. Birrell*, 127 Va. 166, 169-79, 102 S.E. 762, 763-66 (1920), which, as the undisputed evidence at trial showed, was paid for through the last month of occupancy. The Game Place, therefore, had no further rent obligation to Fredericksburg 35.

### III.

In sum, the trial court erred as a matter of law by enforcing the lease and ordering The Game Place and Lightburn to pay unpaid rent and attorney fees. We reverse and enter final judgment in favor of The Game Place and Lightburn.[24]

---

[24] The trial court's award in favor Fredericksburg 35 against Lightburn was solely against Lightburn in his capacity as an alleged guarantor of the lease. *See supra* note 3. Because we reverse the award against The Game Place, it follows that Lightburn has no independent guarantor liability. *See Bourne v. Board of Supervisors*, 161 Va. 678, 684, 172 S.E. 245, 247

18

*Reversed and final judgment.*

(1934) (noting that a principal's obligation and that of a guarantor are separate, but stating that "[i]f there is no obligation on the part of the principal, there is none on the guarantor." (citation omitted)); *C.S. Luck & Sons, Inc. v. Boatwright*, 157 Va. 490, 495, 162 S.E. 53, 54 (1932) ("Of course if the principal contractor is not liable his surety is not, for it would be a solecism to hold that he is bound beyond his principal.").