COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Athey and Fulton
Argued at Lexington, Virginia

PUBLISHED

KELLY LEIGH HARRIS

v.        Record No. 1083-23-3

WASHINGTON & LEE UNIVERSITY

OPINION BY
JUDGE CLIFFORD L. ATHEY, JR.
OCTOBER 1, 2024

FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Thomas E. Strelka (L. Leigh Rhoads; Brittany M. Haddox;
Monica L. Mroz; Strelka Employment Law, on brief), for appellant.

Tracy Taylor Hague (Anne Graham Bibeau; Elaine D. McCafferty;
Woods Rodgers Vandeventer Black PLC; Woods Rogers PLC, on
brief), for appellee.

On June 7, 2023, the Circuit Court of Rockbridge County ("circuit court") sustained a plea in bar dismissing wrongful termination claims made by Kelly Leigh Harris ("Harris") against Washington & Lee University ("W&L") under the Virginia Whistleblower Protection Law ("VWPL"), Code § 40.1-27.3. Harris assigns error to the circuit court: 1) for determining, based upon the VWPL and "undisputed evidence," that Harris was not an employee of W&L; 2) for misinterpreting the terms "employer" and "employee" in Code § 40.1-2; 3) for determining that Harris could not have reported any alleged violations to a supervisor "as she did not have a supervisor at [W&L]"; 4) for holding that W&L's plea in bar did not "involve[] . . . disputed factual issue[s]" based upon the factors enunciated in *Butler v. Drive Auto Industries of America*, 793 F.3d 404 (4th Cir. 2015); and 5) for failing to rule on "whether [she] reported any alleged violations of any federal or state law or regulation as required by [the VWPL]." Finding no error, we affirm the circuit court's judgment.

I. BACKGROUND[1]

On June 1, 2015, Harris began her employment as the house director for the Zeta Deuteron chapter of the Phi Gamma Delta ("PGD") fraternity located on the campus of W&L. Harris had previously applied for the position of house director by sending her employment application to Mark Muchmore ("Muchmore"), the President of PGD's House Corporation. Muchmore subsequently interviewed Harris and offered her the position as house director that she accepted. Before Harris commenced her employment, both she and Muchmore executed an Employment Agreement ("Agreement"), which contained the terms and conditions of her employment with House Corporation.

W&L owned the PGD fraternity house. As a consequence of the terms in its lease of the fraternity house to PGD, W&L required PGD to comply with W&L's policies. W&L's policies required all Panhellenic organizations to employ and maintain house directors during the school year. However, W&L was neither a party nor signatory on the Agreement between House Corporation and Harris, and W&L did not participate in either Harris's job interview or in the hiring decision.[2]

The terms of the Agreement also made clear that Harris's employment was "at[-]will" and that she was to receive a monthly paycheck from House Corporation consistent with the

---

[1] As the circuit court held an evidentiary hearing on W&L's plea in bar, "[a]ccording to well settled principles, we recite the relevant facts in the light most favorable to [W&L], . . . the prevailing party in the circuit court." *Nichols Constr. Corp. v. Va. Mach. Tool Co., LLC*, 276 Va. 81, 84 (2008). To note, some pleadings and parts of the record in this matter were filed under seal. Hence, "this appeal requires unsealing certain portions to resolve the issues raised by the parties. [Thus,] [t]o the extent that certain facts mentioned in this opinion are found in the sealed portions of the record, we unseal only those portions." *Chaphe v. Skeens*, 80 Va. App. 556, 559 n.2 (2024) (quoting *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022)).

[2] Harris cites to several parts of the record she alleges support her assertion that W&L participated in her hiring decision. However, after reviewing her citations, we find that they do not support her assertion.

salary outlined in the Agreement. In addition, pursuant to terms of the Agreement, Harris was: 1) to receive a stipend from House Corporation to assist her in purchasing her own health insurance; 2) given permission to seek reimbursement from House Corporation when Harris incurred personal expenses on behalf of PGD in her role as house director; and 3) to live in a cottage located on the grounds of the PGD fraternity house. The cottage was also owned by W&L and leased to PGD. The Agreement also required House Corporation to cover the utility and other miscellaneous costs necessary for Harris to occupy the cottage. But W&L was neither a payor of Harris's salary, nor did W&L pay for her health insurance stipend, nor did W&L provide her a W-2 form for tax purposes.

The Agreement generally charged Harris, as house director, with being "responsible to the house corporation for managing the day-to-day affairs of the chapter house," which included caring for the house, arranging for repairs, and "mak[ing] sure the boys complied with all of the rules of [W&L]." The House Corporation maintained supervisory authority over the house directors,[3] but Harris was required to communicate with "liaison[s]" at W&L regarding issues pertinent to the fraternity or to maintaining its house.

During her employment as house director, Harris was a self-described "squeaky wheel," taking issue with students for failing to comply with PGD's requirements. In March of 2020, W&L circulated guidelines to help mitigate the deleterious effects of the COVID-19 pandemic. The guidelines tasked house directors with reporting guideline violations to Chris Reid ("Reid"), W&L's Director of Resident Life. Harris subsequently reported to Reid that students had returned to fraternity housing seven days before W&L had begun testing for COVID-19, that

---

[3] Harris also testified in her deposition that she drafted rules and guidelines for the Zeta Deuteron chapter that "compli[ed] with the [W&L] guidelines as well as [PGD] International Laws," one of which stated that the "house director is an employee of the [H]ouse [C]orporation."

- 3 -

some PGD members and visitors were not masking and socially distancing while at the PGD fraternity house, and that the fraternity house's services were not in compliance with W&L's COVID-19 policies. As a result of the reported violations, Reid coordinated with House Corporation to address Harris's various violation reports. However, Reid did not reprimand the reported students as requested by Harris.

The week of January 21, 2021, a local newspaper reported receiving an anonymous report from an unnamed house director that W&L was not testing students for COVID-19 before allowing them to return to fraternity housing. A reporter from the newspaper had contacted W&L for comment on January 21, 2021, and the request for comment was then forwarded to W&L's Dean of Student Life, David Leonard ("Leonard"). Leonard advised in an email chain to other W&L staff members that he had "[n]o doubt this is from . . . Harris at [PGD]." Leonard also advised in the email chain that he was going to have Reid "reach out" to Harris to "discuss the concern and her poor judgement in [supposedly] contacting the paper." He further noted that he had discussed with Muchmore PGD "cut[ting] her loose."

The following week, on January 28, 2021, Harris's frustrations with W&L's failure to discipline certain members of the PGD fraternity finally boiled over. She emailed Reid demanding that he reprimand certain students whom she had previously reported for violations of the COVID-19 policy. She also accused Reid and W&L of ignoring her previous complaints of COVID-19 related violations. She further accused W&L of violating executive orders issued by the Governor of Virginia related to the COVID-19 pandemic. Finally, she criticized Reid's previous responses to her concerns, stating that they were insufficient to address the issues. Her email exchange with Reid was copied to various officials at W&L. Reid responded by rebuking Harris for sending a "highly inappropriate email" and for "cop[ying] everyone on [it]." Reid also

warned Harris that he would "be addressing this with M[uchmore] and others in Student Affairs" in the near future.

That same day, Leonard contacted Muchmore concerning his suspicion that Harris was the anonymous house director who had contacted the local reporter. He also forwarded the email sent by Harris to Reid and copied to numerous W&L employees. Leonard further advised Muchmore that in his opinion, Harris "[h]a[d] lost the respect of the majority of those of us working for [W&L]." He suggested that Harris's conduct should be addressed by "directly confronting her behavior from here on out." Muchmore forwarded Leonard's email to House Corporation's treasurer commenting: "I think this is it. We've talked to her multiple times about this kind of communication. She may not be wrong about her frustrations, but her tone and approach keep creating an issue with [W&L]." Muchmore also emailed Harris that he had "heard from multiple people" and that he and Harris "need[ed] to discuss this tonight." Muchmore then called Harris on January 30, 2021, and terminated her at-will employment as PGD's house director.

Following her termination, Harris signed a Separation and Release Agreement ("Separation and Release") with House Corporation. Pursuant to the terms of the Separation and Release, she received six months of severance pay, six months of supplemental payments to cover her health insurance costs, and $1,000 for moving expenses. In exchange, she agreed not to bring any suit, including but not limited to a suit for wrongful termination against House Corporation or its employees. W&L was not a party nor a signatory regarding the Separation and Release.

On January 24, 2022, Harris filed a complaint against W&L asserting that it had violated the VWPL by retaliating against her for reporting alleged violations of its COVID-19 policies that resulted in the termination of her employment by House Corporation. W&L responded to

Harris's complaint by filing a demurrer and an answer on March 10, 2022. Harris and W&L subsequently conducted discovery, including depositions of Harris, Muchmore, Reid, and Leonard.[4]

During her deposition, Harris asserted that "[W&L] expect[ed] House Corporation to provide a substitute house director if the regular house director was going to be away from the house for more than one night," impeding her ability to leave the cottage for more than one night. Harris further stated that she thought Reid, a W&L employee, was her "go-to person" because "he was over the house directors, and we were to send things to him about the students." She also contended that W&L had told house directors that they were "supposed to report violations of rules or guidelines" to Reid. When asked what "entities" she considered to be her employer, she considered PGD one of her employers because she "got [her] paychecks from [PGD]." Although Harris also considered W&L to be her employer because "[she] had to follow their rules and regulations," she conceded multiple times during her deposition that she was not an "employee" of W&L. Harris also admitted that her actual employer was House Corporation and that Muchmore, who was not a W&L employee, was her supervisor. She further admitted that W&L did not have any input in whether she was hired for the position of house director. Harris even acknowledged that when she applied for unemployment benefits, she "listed [her] employer as being [House Corporation]."

During his deposition, Muchmore contended that W&L's lease of the PGD fraternity house to House Corporation required PGD to hire a house director "in specific language in the lease with [W&L]." He also acknowledged that a "key component" of the house director position was to "regularly communicate with people at W&L." However, Muchmore explained

[4] Some of these depositions are partially included in the record before this Court. These same depositions or partial depositions were also marked as exhibits and introduced as evidence before the circuit court at the evidentiary hearing.

that, even though W&L required fraternities to hire house directors, those directors did not work for W&L. Finally, Muchmore contended that Harris performed her duties as house director at the direction of House Corporation, reported to him as her supervisor, and was terminated by him without W&L's input.

Similarly, both Reid and Leonard confirmed the nature of the relationship between house directors and W&L. For example, Leonard specifically stated that W&L does not "provide any oversight of house directors," and house directors are not required to "report to" W&L officials. Leonard also stated that he was unaware of how these house directors were hired and unsure if W&L reviewed application materials submitted for the positions. Although Reid confirmed Leonard's impression of the relationship between W&L and house directors, he did acknowledge that Harris had reported "university [COVID-19] policy violations" to him previously and that she had done so at the time of the emails in question.

On March 20, 2023, W&L filed a plea in bar asserting that Harris's claim was barred because her suit fell outside of the ambit of the VWPL for three reasons: 1) she was not a W&L employee; 2) the VWPL only protects employees reporting violations of a federal or state law or regulation, not violations of school policy; and 3) she could not have reported any alleged violations of a federal or state law or regulation to her supervisor at W&L since she was not an employee of W&L and thus had no W&L supervisor. Harris moved to strike W&L's plea in bar on March 24, 2023. Harris also demanded the empaneling of a jury to consider and resolve the issues raised in W&L's plea in bar. W&L responded by moving to strike Harris's jury demand, asserting that the plea in bar addressed solely a matter of law. Harris opposed W&L's motion to strike the jury demand, contending that a factual dispute existed concerning whether W&L and PGD were her joint employers consistent with the holding in *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404 (4th Cir. 2015). Following the April 5, 2023 motions

hearing, the circuit court issued a letter opinion striking the jury demand after finding that no disputed facts existed based upon the meaning of "employee" in the VWPL.

The parties subsequently filed briefs in support of and in opposition to the plea in bar. W&L contended that, because Harris failed to provide any evidence that she received any wages, salaries, or commissions from W&L, she lacked standing as a whistleblower employee pursuant to the VWPL. Harris opposed the plea in bar, asserting that W&L was Harris's "joint employer" consistent with the holding in *Butler* and thus that she possessed standing to bring suit as a statutorily protected whistleblower.

After hearing argument on May 4, 2023, the circuit court deliberated and then pronounced its decision from the bench,[5] which was later summarized into its final written order. The circuit court found, "[a]fter reviewing the briefs, weighing the evidence presented by the parties, and hearing argument of counsel, the Court finds, based upon the undisputed evidence, that [Harris] was not an employee of Washington and Lee University as that term is defined in within V[irgina]Code § 40.1-2." Further, as a result of this holding, the circuit found that "[Harris] did not report any alleged violations to a supervisor at Washington and Lee University [under the VWPL] as she did not have a supervisor at Washington and Lee University." As a result, the circuit court sustained W&L's plea in bar. Subsequently, the circuit court entered a final order dismissing the case with prejudice. Harris appealed.

---

[5] Note, Harris filed a partial transcript with only the judge's ruling from the May 4, 2023 hearing. But as she filed it on September 14, 2023, it was filed late and therefore, is not part of the record. *See* Rule 5A:8(a).

II. ANALYSIS

A. *Standard of Review*

Where the "parties presented evidence on the plea *ore tenus*, the circuit court's factual findings are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support." *Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019) (quoting *Hawthorne v. VanMarter*, 279 Va. 566, 577 (2010)).[6] We review "pure legal questions, including questions of statutory construction" underpinning the circuit court's judgment de novo. *Id.*

B. *Although Code § 40.1-2 contemplates the existence of a shared employment arrangement, the statute's text and the evidence before the circuit court support its finding that Harris was not an employee shared with W&L.*

Harris assigns error to the circuit court for sustaining the plea in bar against her claims. She asserts that the circuit court erred because: 1) the definitions of "employer" and "employee" within Code § 40.1-2 "do not foreclose the possibility" of W&L being found to be her employer; 2) the holding in *Butler v. Drive Auto Industries of America, Inc.*, 793 F.3d 404 (4th Cir. 2015), applies to her claim under Virginia law; 3) her complaint had "involved disputed factual issue[s]" regarding whether she was an employee of W&L who had a supervisor at W&L; and 4) the circuit court declined to rule on "whether [Harris] reported any alleged violations of any

---

[6] To note, the parties are correct that the Supreme Court has not determined the standard of review applicable to the grant or denial of a motion to strike a jury demand. *See, e.g.*, *Bethel Inv. Co. v. City of Hampton*, 272 Va. 765, 770 (2006) (holding the right to trial by jury, when properly invoked, applies to pleas in bar involving issues of disputed fact, without expressing the standard of review). But we find that the "plainly wrong or without evidentiary support" standard of review subsumes the portion of Harris's assignment of error that avers the circuit court erred by denying her demand to have a jury empaneled to resolve any factual disputes at the plea hearing because the circuit court heard evidence *ore tenus*. *Upper Occoquan Sewage Auth. v. Blake Constr. Co.*, 266 Va. 582, 591 (2003) (finding that jury findings made on a factual issue raised at the plea in bar stage may only be reversed if they are "plainly wrong or without evidentiary support"). Thus, we decline to opine further on the specific standard of review for denials of jury demands for pleas in bar.

federal or state law or regulation as required by [the VWPL]." We agree in part and disagree in part.

            1. The plain language of the "employer" and "employee" definitions within Code § 40.1-2 contemplates that an employee could have more than one employer.

As a threshold matter, Harris asserts that the text of the definitions of "employer" and "employee" within Code § 40.1-2 are broad enough to encompass employment relationships where an employee has more than one employer. W&L counters by contending that the plain language of the definitions as well as the Supreme Court of Virginia's holding in *Cornell v. Benedict*, 301 Va. 342 (2022), bars Harris's interpretation of the statute. We agree with Harris.

To resolve this assignment of error, we must interpret the text of the definitions for "employer" and "employee" contained within Code § 40.1-2 to determine whether the definitions would permit the statute's application to employment relationships involving more than one employer employing a single employee. "In interpreting [a] statute, 'courts apply the plain meaning . . . unless the terms are ambiguous or applying the plain language would lead to an absurd result.'" *Miller & Rhoads Bldg., L.L.C. v. City of Richmond*, 292 Va. 537, 541 (2016) (quoting *Baker v. Commonwealth*, 284 Va. 572, 576 (2012)).

> [A] statute is ambiguous when its language is capable of more senses than one, difficult to comprehend or distinguish, of doubtful import, of doubtful or uncertain nature, of doubtful purport, open to various interpretations, or wanting clearness of definiteness, particularly where its words have either no definite sense or else a double one.

*Shepherd v. Conde*, 293 Va. 274, 284 (2017) (quoting *Newberry Station Homeowners Ass'n v. Bd. of Supervisors of Fairfax Cnty.*, 285 Va. 604, 614 (2013)). But where "the language of a statute is unambiguous, we are bound by the plain meaning of that language." *Nalls v. Commonwealth*, 79 Va. App. 712, 718 (2024) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)). As such, "[t]he plain, obvious, and rational meaning of a

statute is to be preferred over any curious, narrow, or strained construction." *Stanton v. Va. Beach - Fire Operations*, 79 Va. App. 587, 592 (2024) (quoting *Ford Motor Co. v. Gordon*, 281 Va. 543, 549 (2011)).

In addition, where possible, "[w]e ordinarily resist a construction of a statute that would render part of a statute superfluous." *Loch Levan Land Ltd. P'ship v. Bd. of Supervisors of Henrico Cnty.*, 297 Va. 674, 685 (2019) (quoting *Davis v. MKR Dev.*, *LLC*, 295 Va. 488, 494 (2018)). And "we have a duty, whenever possible, 'to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal.'" *Stanton*, 79 Va. App. at 592 (quoting *Oraee v. Breeding*, 270 Va. 488, 498 (2005)). A corollary to this rule "is that when a term is used in different sections of a statute, we give it the same meaning in each instance unless there is a clear indication the General Assembly intended a different meaning." *Eberhardt v. Fairfax Cnty. Emps. Ret. Sys. Bd. of Trs.*, 283 Va. 190, 195 (2012). These interpretive rules are in accordance with the time-honored principle that we "presume that the legislature chose, with care, the words it used when it enacted the relevant statute." *Cornell*, 301 Va. at 349 (quoting *Tvardek v. Powhatan Vill. Homeowners Ass'n, Inc.*, 291 Va. 269, 277 (2016)).

Under the VWLP, "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action . . . , because the employee . . . in good faith reports a violation of any federal or state law or regulation." Code § 40.1-27.3(A)(1); *Rivera v. Mantech Int'l Corp.*, 81 Va. App. 170, 175 (2024) (quoting Code § 40.1-27.3(A)(1)).

Code § 40.1-2 further defines, for purposes of this statute, the terms "[e]mployer" and "[e]mployee,"[7] as follows:

> "[e]mployer" means an individual, partnership, association, corporation, legal representative, receiver, trustee, or trustee in bankruptcy doing business in or operating within this Commonwealth *who employs another to work for wages, salaries, or on commission* and *shall include any similar entity acting directly or indirectly in the interest of an employer in relation to an employee*.

(Emphases added). It also provides that "'[e]mployee' means any person who, *in consideration of wages, salaries or commissions*, may be permitted, required or directed by *any employer* to engage in *any employment* directly or indirectly." *Id.* (emphases added). We have "previously held that 'wages,' is a term applied to compensation paid to an employee as consideration for work, which constitutes a real economic gain to the employee." *Key Risk Ins. Co. v. Crews*, 60 Va. App. 335, 347 (2012). In addition, "'salary' is generally defined as 'a fixed annual or periodical payment for services, depending upon the time and not upon the amount of services rendered.'" *Home Beneficial Life Ins. Co. v. Unemployment Comp. Comm'n*, 181 Va. 811, 821 (1943). And "'[c]ommissions,' when 'used to express compensation for services rendered,' usually denotes 'a percentage on the amount of moneys paid out or received.'" *Id.* at 820 (quoting *Purifoy v. Godfrey*, 16 So. 701, 703 (Ala. 1894)).

Also, for purposes of interpreting a statute, the term "shall" may be read as "mandatory or directory—depend[ing] entirely on the legislature's intended meaning as discerned from 'the nature, context, and purpose' of the relevant statute." *Bland-Henderson v. Commonwealth*, 303 Va. 212, 219 (2024) (quoting *Huffman v. Kite*, 198 Va. 196, 202 (1956)). We further find that

_____

[7] The definitions within Code § 40.1-2 first appeared in 1962, in Chapter 66 of the Acts of Assembly, Senate Bill 61 as Code § 40-1.1. In passing this bill, the General Assembly provided that this section was "recommended in order to define terms used throughout Title 40 to avoid repetition of complete definitions." Senate Report Doc. No. 9, *Revision of Certain Labor Laws contained in Chapters 1, 2 and 3 of Title 40 of the Code of Virginia*, 6 ¶ 2 (1962).

"the use of the disjunctive word 'or,' rather than the conjunctive 'and,' signifies the availability of alternative choices." *Williams v. Commonwealth*, 61 Va. App. 1, 8 (2012) (quoting *Rose v. Commonwealth*, 53 Va. App. 505, 514 (2009)). Also, "'[a]ny' is defined, in part, as 'one or some *indiscriminately* of *whatever kind*'; 'one or more indiscriminately from all those of a kind'; or 'one that is selected *without restriction or limitation of choice*.'" *Botkin v. Commonwealth*, 296 Va. 309, 314 (2018) (quoting *Any*, *Webster's Third New Int'l Dictionary* (2002)).

Finally, "[t]he maxim of *noscitur a sociis* provides that the meaning of doubtful words in a statute may be determined by reference to their association with related words and phrases." *Cuccinelli*, 283 Va. at 432 (quoting *Andrews v. Ring*, 266 Va. 311, 319 (2003)). Thus, "[w]hen general words and specific words are grouped together, the general words are limited and qualified by the specific words and will be construed to embrace only objects similar in nature to those objects identified by the specific words." *Id.*

Turning to the interpretation of the term "employer" within Code § 40.1-2, the Supreme Court of Virginia held in in *Cornell*, that the plain language contained within the definition precluded *individuals* from joint liability under Virginia's unpaid wages statute because the term omitted the word "person," creating a narrower definition than the one provided for in the Federal Fair Labor Standards Act ("FLSA"),[8] which provided for such joint liability. 301 Va. at 351.

Here, by analyzing the plain text of the definitions for the term "employer" and "employee" in Code § 40.1-2, we find that the General Assembly intended for the terms to encompass at least some of those relationships between an employee with more than one employer. To begin, the definition of "[e]mployer" "shall include *any* similar entity acting

---

[8] The FLSA provided for joint liability against individual non-entity employers. *See Cornell*, 301 Va. at 349.

directly or indirectly in the interest of an employer in relation to an employee." Code § 40.1-2 (emphasis added). In examining this statutory scheme's "nature, context, and purpose" we note that the General Assembly's use of the term "shall" in the employer definition is evocative of a "mandatory" command, explicitly requiring that such an entity be included in the ambit of the statute. *Bland-Henderson*, 303 Va. at 219 (quoting *Huffman*, 198 Va. at 202). Hence, from this command, we find that the General Assembly mandated that such "similar entit[ies] acting directly or indirectly in the interest of an employer in relation to an employee" fall within the definition. Code § 40.1-2. The fact that this term encompasses more than a single employer is further supported by the definition of "employee." *Id.* The General Assembly provides in Code § 40.1-2 that "[e]mployee[s]" are "*any* person who, *in consideration of wages, salaries or commissions*, may be permitted, required or directed by *any employer* to engage in *any employment* directly or indirectly." (Emphases added). By choosing the term "any" to modify "employer" the text permits the possibility that an employee may be "employ[ed]" by more than one employer, as it provides no limiting qualifier such as "their" or "the." *See Botkin*, 296 Va. at 314-15. Also, in the "employer" definition, the General Assembly qualifies that the "similar entity" encompassed by the term is to "act[] directly or indirectly in the interest of an employer in relation to an employee," which is language evocative of requiring it to either owe a duty to the principal entity or to maintain some form of privity with it. *See, e.g.*, *Race Fork Coal Co. v. Turner*, 237 Va. 639, 643 (1989) ("We have said that '[w]hile privity generally involves a party *so identical in interest with another that he represents the same legal right*, a determination of just who are privies requires a careful examination into the circumstances of each case.'" (quoting *Nero v. Ferris*, 222 Va. 807, 813 (1981))); *Burruss v. Green Auction & Realty Co.*, 228 Va. 6, 10-11 (1984) ("Joint venturers, like partners, have the dual status of principals for themselves and agents for all other joint venturers, within the scope of the enterprise. Each has a

*high degree of fiduciary duty toward the others* arising out of the confidential relationship between them." (emphasis added) (internal citations omitted)). Hence, from the meaning of the plain text alone, we find that the General Assembly explicitly provided that an employee may have more than one employer and that this second employer must owe a duty or have privity with the principal employer.

Continuing to parse the text of the "employer" definition, we find three qualifications that apply to "similar entit[ies]" who may be additional employers of an employee. Code § 40.1-2. First, by using the term "similar," the General Assembly evokes "[t]he maxim of *noscitur a sociis*," providing that the meaning of said term "may be determined by reference to their association with related words and phrases" contained within the "employer" and "employee" definitions. *Cuccinelli*, 283 Va. at 432. Applying this maxim, Code § 40.1-2 requires that such entity be one of the types of entities already listed in the definition. The maxim also requires that this entity "employ"[9] the employee and pay them "wages, salaries, or on commission." Code § 40.1-2. To interpret this requirement otherwise would be to render the General Assembly's use of the qualifier "wages, salaries, or on commission" in both definitions a surplusage, a result we endeavor to avoid. *See Loch Levan*, 297 Va. at 685.

Hence, extrapolating from the plain language within Code § 40.1-2, we hold that the plain meaning of the terms "employer" and "employee" permit employees to have more than one employer in certain cases where the second employer is a "similar entity" to the first employer. Code § 40.1-2. We further hold that in order for the employers to be "similar entit[ies]," the employing entities must be: 1) the same types of entities as those already expressly provided for in the "employer" definition; 2) an employer which "employ[s]" the employee in question in

_____

[9] Code § 40.1-2 defines "employ," as to "permit or suffer to work," which indicates that this entity must have control over the continuation of the relationship.

- 15 -

exchange for "wages, salaries, or . . . commission"; and 3) an employer/entity that owes some duty or has some form of privity with the principal employer/entity. *Id.*

In addition, although we find that much of the definition of employer in the statute is unambiguous, we acknowledge that the term "similar entity" in the "employer" definition in Code § 40.1-2 is relationally ambiguous. Beyond the specifics of what type of entities are a "similar entity" and what an entity must do to qualify as an "employer" under the statute, very little with respect to its application can be derived from the term itself. *Id.* As Harris contends on brief, the term provides no indication of whether and to what extent the employer controls the employee's tasks, whether the similar entity possesses the power to hire or terminate the employee, the time the employee spent in the particular role, the employee's duties in their position, and other general characteristics of employment that generally may be considered in making the determination of whether an employer-employee relationship exists. Hence, the term "lacks clearness and definiteness" in relation to the evidence that is relevant to determining what constitutes a similar entity. *Lee-Warren v. School Bd. of Cumberland Cnty.*, 241 Va. 442, 445 (1991). Thus, we are required to interpret the term "similar entity" in light of its context within the statute because we are tasked with determining if Harris alleges facts sufficient to show that W&L could also have been her "employer."[10]  Code § 40.1-2.

---

[10] We also note that W&L's argument to the contrary, that *Cornell v. Benedict* forecloses such employment relationships, is unavailing. 301 Va. at 351. The question before the Supreme Court of Virginia in *Cornell* was whether individuals in their *personal* capacity could be held jointly liable with their employing entity. *Id.* at 349. The *Cornell* Court held that, because the preceding list of entities contained within the Code § 40.1-2 "employer" definition neglected to include "person," the definition itself precluded *personal* liability. *Id.* at 351. That holding has no bearing on the question before this Court today: whether or not the employer definition within Code § 40.1-2 permits liability against two different employers which are similar *entities*.

- 16 -

2. The circuit court did not err in analyzing the application of *Butler v. Drive Automotive Industries of America, Inc.* to this matter since the Virginia common law borrowed employee doctrine controls in determining what is a similar entity in this case.

Harris next asserts that, because the definitions of "employer" and "employee" in Code § 40.1-2 include an employee who may be employed by more than one employer, a factual dispute existed regarding whether or not Harris was also employed by W&L because she presented facts that met some of the factors required in *Butler*, 793 F.3d at 414, to establish a "joint-employment" arrangement. In support, Harris claims that *Butler* applies here because the Fourth Circuit's reasoning in that case is "similar to many of the tests used to evaluate nonstandard employment relationships." However, as she conceded at oral argument, Virginia has never adopted the reasoning in *Butler*.

In order to resolve this assignment of error, we first note that the terms to be defined are terms of art related to Virginia's common law tradition pertaining to nonstandard employer-employee arrangements. We further note that:

> when a statute employs a common-law term of art, the General Assembly "is presumed to have known and to have had the common law in mind in the enactment of a statute." Thus, we must "giv[e] effect to both 'unless it clearly appears from express language or by necessary implication that the purpose of the statute was to change the common law.'"

*Game Place, L.L.C. v. Fredericksburg 35, LLC*, 295 Va. 396, 402 (2018) (quoting *Jenkins v. Mehra*, 281 Va. 37, 44 (2011)). "Abrogation of the common law thus occurs only when 'the legislative intent to do so is plainly manifested,' as '*there is a presumption that no change was intended.*'" *Jenkins*, 281 Va. at 44 (emphasis added) (quoting *Isbell v. Com. Inv. Assocs., Inc.*, 273 Va. 605, 613-14 (2007)).

In accordance with Supreme Court of Virginia precedent, we have "recognized that, at common law, an employee may be borrowed by one employer from another." *Liberty Mut. Ins.*

- 17 -

*Corp. v. Herndon*, 59 Va. App. 544, 563 (2012). "Under the borrowed [or loaned] [employee] doctrine, a worker, although directly employed by one entity, may be transferred to the service of another so that he becomes the employee of the second entity 'with all the legal consequences of the new relation.'" *Metro Machine Corp. v. Mizenko*, 244 Va. 78, 82 (1992) (quoting *Standard Oil v. Anderson*, 212 U.S. 215, 220 (1909)). In these dual employment relationships, "it is generally understood that 'the lending employer is known as the "general employer" and the borrowing employer, the "special employer."'" *Smith v. McMillan Pers. Serv.*, 48 Va. App. 208, 217 (2006) (quoting 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 67.01[1], p. 67-2 (2001) (interpreting the Virginia Workers' Compensation Act)). The general employer is the employer "who may have made the express contract of employment of the [employee] and may pay the [employee] his wages." *Ideal Steam Laundry v. Williams*, 153 Va. 176, 180 (1929). Whereas the employer now controlling the employee's labor is the employee's "special employer." *See Va. Polytechnic & State Univ. v. Frye*, 6 Va. App. 589, 592 (1988). The employees in these types of employment arrangements are referred to as either "borrowed" or "loaned" employees. *Metro Machine*, 244 Va. at 83 (applying the doctrine equally to "loaned or borrowed [employees]" without delineating a difference between the terms).[11] We have previously applied the borrowed employee doctrine in statutory schemes regarding labor where the general terms "employer" and "employee" do not explicitly mention "special employers or [borrowed] employees" because the doctrine's common law underpinnings relate to "resolv[ing] dual employer situations." *Frye*, 6 Va. App. at 592; *see, e.g.*, *Ideal Steam Laundry*, 153 Va. at 179-82 (concluding that although the Virginia Workers' Compensation Act "is silent with reference to the status of a [borrowed] employee," the common law governing

---

[11] For consistency purposes, we use "borrowed employee" to describe the doctrine from here onward.

employers and employees applies to determine whether an individual was acting as an employee of another).

"To determine whether a party is a special employer, we examine four elements of the [employer-employee] relationship: (1) selection and hiring of the [employee]; (2) payment of his or her wages; (3) power of dismissal; and (4) power of control of the [employee's] actions." *Frye*, 6 Va. App. at 593 (quoting *Smith v. Grenadier*, 203 Va. 740, 746 (1962)). At common law, "control over the employee is the most important factor in consideration of the borrowed [employee] status, although it alone may not be dispositive." *Liberty Mut. Ins.*, 59 Va. App. at 564. However, applying this doctrine, "an employee who is lent to a special employer . . . becomes the [employee] of the employer to whom he is lent' only if the employee 'assents to the change in employment.'" *Smith*, 48 Va. App. at 219 (quoting *Ideal Steam Laundry*, 153 Va. at 181-82). "The employee's assent may be shown by 'explicit or implied consent to working for an employer other than [the general employer].'" *Id.* (quoting *Marshall Erdman & Assocs. v. Loehr*, 24 Va. App. 670, 677 (1997) (alteration in original)).

Hence, when interpreting the meaning of the term "similar entity" in Code § 40.1-2, we hold that the unabrogated common law "borrowed employee doctrine" governs our consideration of the meaning of the terms "employer" and "employee" as well as the mechanics of determining whether employers are "similar entities." As we previously held, the definitions of "employer" and "employee" within Code § 40.1-2 permit employment arrangements where an employee has more than one employer. We also found that pursuant to the statute, the employers in such an arrangement must be "similar entities." Thus, since Code § 40.1-2 does not provide an unambiguous definition of "similar entity," the meaning of that term is ambiguous. In analyzing such ambiguity, we must presume that the General Assembly knew the common law and had it in mind when enacting Code § 40.1-2, *see Game Place*, 295 Va. at 402, and we must "giv[e]

- 19 -

effect to [to that understanding] 'unless it clearly appears from express language or by necessary implication that the purpose of the statute was to change the common law,'" *Jenkins*, 281 Va. at 44. Therefore, based on the text of the definition of "employer" in Code § 40.1-2, we find that the General Assembly imported the long-adopted borrowed employee doctrine to guide our courts in determining whether employers are "similar entities." We reach this conclusion, in part, because this Court has previously applied the borrowed employee doctrine at common law to other statutory schemes involving employment to "resolve dual employer situations" like the relationship alleged by Harris here. *Frye*, 6 Va. App. at 592.

However, since Code § 40.1-2 clearly requires that an employer must pay and an employee must work for "wages, salaries, or . . . commission," we also find that the General Assembly conveyed its plain intention to amend the common law borrowed employee doctrine in the determination of whether an employer and employee qualify as such under the Act. *See Jenkins*, 281 Va. at 44. Thus, we further find that the payment of such "wages, salaries, or . . . commission," by the alleged "special employer" and the receipt thereof are mandatory threshold conditions that the putative borrowed employee must satisfy in order to be within the statute's protection.[12] *See* Code § 40.1-2; *Frye*, 6 Va. App. at 592. The alleged borrowed employee may then show that an employment relationship existed through the evidence related to the other common law factors pertaining to which entity selected and hired the employee, which entity had the power to dismiss the employee, and which entity had the power to control the employee's actions. *Frye*, 6 Va. App. at 593. It remains true that the borrowed employee in these cases must

---

[12] This conclusion from the provision's explicit text is supported by the fact that "[e]ven at common law the existence of the relationship of [employer and employee] does not depend upon the payment of wages or a salary by a[n employer] direct to the [employee]." *Unemployment Comp. Com. v. Harvey*, 179 Va. 202, 215 (1942). By providing otherwise in the definitions of "employer" and "employee" in Code § 40.1-2, the General Assembly plainly evinced an intent to "[a]brogat[e] the common law rule," *Jenkins*, 281 Va. at 44, which we must respect when interpreting the provision.

explicitly or implicitly "assent[] to the change in employment." *Smith*, 48 Va. App. at 219. In addition, "control over the employee is [an] . . . important factor in consideration of the borrowed [employee] status." *Liberty Mut. Ins.*, 59 Va. App. at 564. But, in light of the plain text of Code § 40.1-2, payment and receipt of "wages, salaries, or . . . commission" is now the most important factor in determining whether or not an entity is a special employer.

By adopting the application of the borrowed employee doctrine, we decline to adopt the reasoning of *Butler*, as requested by Harris. "While this Court considers Fourth Circuit decisions as persuasive authority, such decisions are not binding precedent for the decisions of this Court." *Toghill v. Commonwealth*, 289 Va. 220, 227 (2015). As persuasive authority, *Butler* provides some guidance concerning what evidence at a granular level is needed to support a finding that W&L is a "similar entity" for our purposes. But even *Butler* "note[d] that none of these factors are dispositive and that the common-law element of control remains the 'principal guidepost' in the analysis." 793 F.3d at 414. Moreover, the definitions of "employer" and "employee" contained within Code § 40.1-2, "are [not] circular," and we note that they largely mirror Virginia's existing common law doctrine and are more expansive than the statutory scheme analyzed in *Butler*. *Id.* at 408. Hence, the Fourth Circuit in *Butler* admitted to the common law's impact on this inquiry, and thus we find the common law framework of the borrowed employee doctrine, long adopted and ingrained in Virginia law, to be "the principal guidepost," *see Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003), for deciding what a "similar entity" is under Code § 40.1-2. Therefore, the circuit court did not err in declining to apply *Butler*.

- 21 -

C. *The circuit court was not plainly wrong in finding that the facts in the record did not create a factual dispute regarding whether Harris was an employee of W&L or had a supervisor at W&L.*[13]

Finally, Harris assigns error to the circuit court for finding that W&L's plea in bar did not "involve [a] disputed factual issu[e]" regarding whether her "allegations support[ed] a finding that she was [W&L's] employee as that term is defined in § 40.1-2." In light of our interpretation of Code § 40.1-2 and the facts adduced *ore tenus* at the prior evidentiary hearing, we disagree.[14]

"A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery." *Cornell*, 301 Va. at 349 (quoting *Massenburg*, 298 Va. at 216). "The party asserting a plea in bar bears the burden of proof on the issue presented." *Hawthorne*, 279 Va. at 577. "Simply holding an evidentiary hearing does not convert all of the arguments for and against the

---

[13] Since we find that the circuit court was not plainly wrong in concluding that Harris was not an employee of W&L and thus did not have a supervisor at W&L, we decline to reach Harris's last assignment of error alleging that the circuit court erred in failing to rule on "whether Plaintiff reported any alleged violations of any federal or state law or regulation as required by Va. Code [§] 40.1-27.3." Also, as that argument was not ruled upon by the circuit court, "there is no ruling for [this Court] to review" and it is waived under Rule 5A:18. *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010) (quoting *Fisher v. Commonwealth*, 16 Va. App. 447, 454 (1993)).

[14] To note, the circuit court's ruling below made the following findings: 1) that "[t]he case at bar is a claim under Code § 40.1-27.3, a statute contained within the same title and chapter as the claim in [*Cornell*, 301 Va. at 349]"; 2) "that for the purposes of this case, 'employee' means any person who, in consideration of wages, salaries or commissions, may be permitted, required or directed by any employer to engage in any employment directly or indirectly"; and 3) that "[t]he parties do not appear to dispute that the plaintiff's allegations in this case do not support a finding that she was the defendant's employee as that term is defined in § 40.1-2." We find none of these findings inconsistent with our reasoning here, but to the extent there is an inconsistency, we affirm the circuit court's judgment "[u]nder the right-result-different-reason principle." *Vandyke v. Commonwealth*, 71 Va. App. 723, 731 (2020) (noting that under this principle "an appellate court 'do[es] not hesitate, in a proper case, where the correct conclusion has been reached but [a different] reason [is] given, to sustain the result [on an alternative] ground'" (quoting *Banks v. Commonwealth*, 280 Va. 612, 617 (2010))). However, we also take no position on the possibility that a supervisor might not be an employee or agent of the employee's employer and nothing in this opinion should be read to imply such.

- 22 -

plea in bar into factual disputes." *Cal. Condo. Ass'n*, 301 Va. at 23. Hence, "[a]n argument asserting a purely legal bar to the pleaded facts, assumed arguendo to be true, can be and should be decided in that manner—so, too, should a purely legal rejoinder to an argument offered in support of a plea in bar." *Id.*

Here, viewing the evidence in the record in the light most favorable to W&L, the circuit court was not plainly wrong in concluding that Harris did not show that a factual dispute existed regarding her putative borrowed employment at W&L. The record before the circuit court showed that Harris was an "at will" employee of House Corporation and that House Corporation was the sole payor of her salary and the party responsible for her employment benefits. Harris failed to adduce any evidence that directly or indirectly established that W&L paid or owed her "wages, salaries, or . . . commission" for her work as PGD's house director. In fact, the record reflected that W&L did not pay any part of Harris's salary, that W&L did not cover any portion of her health insurance stipend, that W&L did not provide her a W-2 form for tax purposes, that W&L did not pay her severance, and that W&L was neither a signatory to Harris's Agreement nor her Separation and Release. Also, contrary to Harris's position at oral argument that "things of value," such as "housing" or "utilities," could constitute "wages, salaries, or commission," we find this assertion rebutted by how this Court and the Supreme Court of Virginia have defined the terms in question. *See, e.g.*, *Home Beneficial*, 181 Va. at 820, 821 (quoting *Purifoy*, 16 So. at 703); *Key Risk*, 60 Va. App. at 339; *see also Eley v. Commonwealth*, 70 Va. App. 158, 165 (2019) (holding that "in ascertaining [the ordinary] meaning of terms we may consult "dictionary definitions and pertinent analysis in prior case law"). These facts together compel the conclusion that W&L could not be deemed her special employer under Code § 40.1-2 since the evidence would neither directly nor indirectly permit an inference that W&L paid Harris any wages

whatsoever. Thus, the circuit court was permitted to conclude from the evidence at the prior hearing that no factual disputes existed and was not plainly wrong for doing so.[15]

The evidence introduced by Harris at the hearing does not impact our conclusion. Harris contends at length on brief that she alleged facts sufficient to show that W&L was her special employer. She claims that because W&L owned the house she was required to live in, required her to stay on the property unless she found someone to cover for her absence, provided her several policies she was compelled to enforce, required PGD to employ someone in her position, and required her to report violations of W&L's policies to Reid, she proved that W&L had sufficient control over her employment to make her a "joint employee." Applying these facts to our interpretation of the definition of "employee" above, we find these facts insufficient to create the factual dispute Harris contends, as they do not show directly or indirectly that W&L paid her "salary, wages, or commission" in exchange for performing her role as a house director. After hearing the evidence and weighing the proffered facts, the circuit court did not find that it was reasonable to infer such payment relationship could exist. *Cf. Stadter v. Siperko*, 52 Va. App. 81, 94 (2008) ("[I]t is well settled that issues of credibility and the weight of the evidence are within the unique province of the trier of fact." (quoting *Parish v. Spaulding*, 26 Va. App. 566, 575 (1998))). Thus, we cannot conclude from Harris's proffer that the circuit court was plainly wrong in finding that Harris failed to show that she was an employee of W&L. Therefore, we affirm the circuit court's judgment.

---

[15] Thus, we decline to consider whether Harris pleaded sufficient facts to show whether she had a supervisor at W&L as we affirm on the grounds that she failed to show that she was an employee of W&L. *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("As we have often said, 'the doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available."'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))). "The 'best' answer to a legal question is the one with which the least number of jurists would disagree or, in other words, the one with which the greatest number of jurists would agree. . . . [While the] 'narrowest' answer to a legal question is the one affecting the least number of cases." *Id.*

III. CONCLUSION

In sum, we hold that the terms "employer" and "employee" in Code § 40.1-2 permit employees to have more than one employer if the employers are "similar entit[ies]" within the meaning of Code § 40.1-2. Code § 40.1-2. These similar entities are those that 1) are the same type of entity as provided for in the "employer" definition; 2) "employ" the employee in question who works in exchange for "wages, salaries, or . . . commission"; and 3) owe some duty or have some form of privity with the principal entity. *Id.* In determining whether an entity qualifies as an additional "employer" under Code § 40.1-2, we are guided by the Virginia common law borrowed employee doctrine. We also hold that the General Assembly has abrogated the common law to the extent of requiring the putative employee to plead facts showing that the "special employer" paid the borrowed employee "wages, salaries, or . . . commission." Because Harris failed to make that showing, we affirm the circuit court's judgment.

*Affirmed.*